UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOHNEISHA SHELTON,

        Plaintiff,

v.                                  Civil Action No. 3:23-cv-844-MHL

EMERGENCY COVERAGE CORPORATION,

and

MEDLYTIX, LLC,

        Defendants.

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, the Plaintiff, Johneisha Shelton ("Ms. Shelton" or "Plaintiff"), on behalf of herself and all others similarly situated, through undersigned counsel, and for her First Amended Complaint against Defendants, Emergency Coverage Corp. ("ECC") and Medlytix, LLC ("Medlytix") (collectively, "Defendants"), pleads the following:

**INTRODUCTION AND PRELIMINARY STATEMENT**

1.     Ms. Shelton, like many Virginians of modest means, receives Medicaid benefits administered by a managed care organization (MCO).

2.     After she was in a car accident and sought emergency treatment, Defendants endeavored to use her Medicaid status against her so they could collect an exorbitant charge from a settlement she recovered in a personal injury action against the at-fault driver.

3.     Defendants falsely insisted that (1) Plaintiff's Medicaid MCO plan afforded her no coverage for her emergency care purportedly provided through Defendant ECC's contracted

physician, Dr. Nevan Chang, and (2) she must pay multiples of the reasonable rate for that care because she receives Medicaid benefits.

4.     The "charge" assessed to Plaintiff for her purported treatment by Dr. Chang, an emergency physician working as a contractor for Defendant ECC, bears no relation to the reasonable charge for the services provided.[1] This "charge" was multiples of Defendant ECC's "actual costs of paying for clinicians and support services." Pro Publica, *How Rich Investors, Not Doctors Profit From Marking Up ER Bills* (June 12, 2020), available at https://www.propublica.org/article/how-rich-investors-not-doctors-profit-from-marking-up-er-bills (last accessed on Dec. 11, 2023). It is a grossly inflated figure intended to feather the nest of the private-equity colossus, Blackstone, which owns TeamHealth, Inc. ("TeamHealth"), the parent company of Defendant ECC. In a 2019 letter to the U.S. Senate in response to congressional inquiries into TeamHealth's billing practices, TeamHealth admitted it has inflated its "list prices" across-the-board well over the cost of the services it provides. It acknowledged that its average cost per encounter was only $150. At the same time, it said it billed 2.5 million uninsured patients and collected $85 million, which it claimed was only 3.7% of what it billed. That means, while TeamHealth's average cost was only $150 per encounter, its prices (the amounts billed to uninsured patients) averaged $918 per encounter in 2019. TeamHealth admitted its prices are over six times its cost of care. TeamHealth dictates the prices of Defendant ECC (and its other subsidiary provider groups).

---

[1] Defendant ECC billed for Dr. Nevan Chang's purported services under List of Current Procedural Terminology (CPT)/Healthcare Common Procedure Coding System (HCPCS) 99284 ("CPT 99284"). CPT 99284, in layman's terms, refers to "[t]he provider see[ing] a patient for an emergency department visit involving evaluation and management (E/M). The visit involves a moderate level of medical decision making." *CPT 99284, Under New or Established Patient*, available at https://www.aapc.com/codes/cpt-codes/99284 (last accessed on Feb. 23, 2024).

5.     Defendant Medlytix integrally involved itself in this scheme, acting in concert with Defendant ECC, to identify and obtain payment from victims.

6.     The amount Defendants demanded from Plaintiff was more than fourteen times the amount Defendant ECC routinely accepted from Medicaid in 2021 for the same services. It is more than nine times the amount received by Defendant ECC for the same services from Medicare, and more than six times the amount commercial insurers typically paid, in 2021, for CPT Code 99284 bills from emergency providers in Central Virginia. In 2021, Medicare reimbursed participating Virginia providers $122.81 for bills issued under CPT 99284, and non-participating providers in Virginia were allowed to bill Medicare beneficiaries a maximum of $134.17 for CPT 99284. Defendant ECC billed Plaintiff $1,177.00 for Dr. Chang's purported services.

7.     Defendants employ their scheme in multiple states, annually gouging numerous consumers.

8.     Defendants have weaponized Medicaid's third-party liability requirements to extract inflated payments from Medicaid beneficiaries who seek emergency treatment after accidents.  To obtain these payments, Defendants send fraudulent bills to Medicaid recipients and their lawyers as well as liability insurers and insurers providing uninsured motorist (UIM) coverage.

9.     As detailed below, federal and state law prohibit the scheme employed by Defendants to collect outsized service charges from Medicaid recipients.

10.    Even assuming federal and state statutes somehow authorized Defendants to seek inflated bills from Medicaid patients, which they do not, courts throughout the country recognize that providers who have not reached an agreement on price with patients, like any other service provider, may only recover the reasonable market value of their services. Ms. Shelton and all

members of the proposed classes below never signed any paperwork with Defendant ECC, much less agreed on concocted, excessive prices for routine emergency medical services. Yet Defendants mercilessly insist that these individuals, among the most disadvantaged in our society, must pay service rates that even Defendants know bear no relation to the reasonable value of the services provided. In so doing, Defendants act in concert to identify prospective victims and use mail and wire fraud to separate them from the proceeds of recoveries on their personal injury claims.

11.     Ms. Shelton brings this lawsuit on a class action basis to recover funds for excessive emergency provider charges unlawfully collected by Defendants from Medicaid recipients. To recover these illegally collected funds, she asserts claims for breach of contract, breach of implied contract, unjust enrichment, and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") and Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA").

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and the FDCPA, 15 U.S.C. § 1692k(d) and RICO, 18 U.S.C. § 1964(c), and has supplemental jurisdiction of the state law claims regarding the same transaction and events under § 28 U.S.C 1367(a).

13.     The Court also has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual proposed class members exceed the sum or value of $5,000,000.00 exclusive of interest and costs, and Plaintiff and many, if not most, members of the proposed classes are citizens of states different from Defendants.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) as "a substantial part of the events or omissions giving rise to the claim occurred" in this Division of this Court. *Id.* Ms.

Shelton is a resident of this Division. Venue is likewise proper under 18 U.S.C. § 1965(a) because Defendants "reside[], [are] found, ha[ve] an agent, or transact[] [their] affairs" in this District and Division. *Id.*

15.    Defendant ECC, through contracted emergency providers, administers medical treatment to thousands of Virginians every year.

16.    Defendant Medlytix, upon information and belief, regularly manages and administers debt collection for alleged defaulted medical billing claims for payment on behalf of Defendant ECC for medical services provided within the Commonwealth of Virginia, involving the citizens of the Commonwealth of Virginia, and as such, Defendant Medlytix, is subject to the personal jurisdiction of this Court as authorized by Virginia Code § 8.01-328.1(A)(1–2). Defendant Medlytix regularly engages and solicits business in Virginia and derives substantial revenue from services rendered in Virginia. Defendant Medlytix provides services to numerous healthcare providers in Virginia. Defendant Medlytix either caused tortious injury to Plaintiff by an act or omission in Virginia or by an act or omission outside of Virginia. In either case, Medlytix is subject to the personal jurisdiction of this Court as authorized by Virginia Code § 8.01-328.1(A)(3-4).

## PARTIES

17.    Plaintiff Johneisha Shelton is an adult individual and a resident and domiciliary of the Commonwealth of Virginia. Plaintiff is a "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3).

18.    Defendant ECC is a Tennessee stock corporation which conducts its business within the Commonwealth of Virginia and maintains its principal place of business located at 265 Brookview Centre Way, Suite 400, Knoxville, TN, 37919. Defendant ECC is registered to do

5

business in the Commonwealth of Virginia through the State Corporation Commission and maintains a registered agent in Richmond, Virginia.

19.     Defendant Medlytix is a Georgia limited liability company with its principal office located at 675 Mansell Road, Suite 100, Roswell, GA, 30076. It transacts business throughout the United States and in Virginia. Medlytix is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

## FACTUAL ALLEGATIONS

### *Defendants' Fraudulent Billing Enterprise*

20.     In violation of federal and state law, Defendants constructed an enterprise (the "Fraudulent Billing Enterprise") to gouge Medicaid recipients who received emergency treatment after accidents.

21.     Medlytix markets itself as providing "revenue and reimbursement intelligence" to "[h]ospitals, physician groups[,] and other providers" who "routinely miss out on a portion of third-party payments from commercial insurance carriers and government aid." *Solutions— MAXIMIZE YOUR REVENUE*, *available at* https://www.medlytix.com/primary-services/ (last accessed on Feb. 24, 2024). It describes itself as a "healthcare consulting and technology company specializing in the field of predictive analytics." *About—Medlytix LLC*, available at https://www.linkedin.com/company/medlytix-llc/ (last accessed on Feb. 24, 2024). By "[u]tilizing sophisticated data mining and scoring strategies, [Medlytix] has successfully enhanced revenue cycles and collections for leading hospitals and healthcare providers across the country." *Id.*

22.     Medlytix touts its ability to "increase[] account reimbursement by identifying new billable insurance coverages and moving accounts from a lower to a higher reimbursement group." *Solutions—MAXIMIZE YOUR REVENUE*, *available at* https://www.medlytix.com/primary-

services/. Medlytix provides its services on a "contingency fee bas[is], meaning [it] only gets paid when [providers] get paid." *Id.* Medlytix makes it clear that providers will obtain maximum collections from individuals who are injured in motor vehicle accidents (MVAs):



*Id.* Medlytix highlights its ability to identify victims like Ms. Shelton through "TPL iQ, [a] [f]ull solution from identification to billing for Third Party Liability claims, including Motor Vehicle Accidents." *Id.* According to its own website, Medlytix's victims pay providers eight times what Medicaid pays and more than double the reimbursement available from commercial insurers like Blue Cross Blue Shield. *Id.*

23.     Medlytix routinely attends professional conferences for medical providers, where it proclaims that "Helping YOU Get Cash in the Door is What We Do!"

24.     Medlytix acts as more than a standard service provider for its healthcare customers. When it takes on a new client such as Defendant ECC, Medlytix integrates itself into and overhauls claims processing and billing procedures for the client. It obtains historical and current billing and collections data and then directs its customer on how to reorder and reorganize often ho-hum "back office" processes to "mov[e] accounts from a lower to a higher reimbursement group." *Id.* Following the establishment of the client relationship, Medlytix continues to evaluate and monitor

billing and collections data and its client's internal processes to continually direct operational adjustments.

25.     Medlytix's involvement with its customers extends beyond oversight and direction of administrative processes. It exerts control over the way frontline providers like Dr. Chang interact with patients and input and code information about those interactions into medical and billing records. The resulting records are used to extract inflated payments from patients like Ms. Shelton.

26.     Customer testimonials on Medlytix's website bear out the extent of its involvement in the operations of its clients:

> Medlytix has been an invaluable partner to our hospital. We very much appreciate their expertise, data and insight in helping us to realize a much needed new cash infusion as well as greatly improving our charity assignment levels and operational efficiency. *CFO, 747 bed urban hospital*

> Partnering with Medlytix has helped my hospital realize over $2.3 million in new cash over the last 18 months. We truly appreciate the partnership between our organizations. *President & CEO of a 500 bed not-for-profit hospital*

> Since implementing the Medlytix scoring system, we have improved our self-pay/uninsured collections by over $1 million per annum while decreasing collection costs by 2 percent. *CFO, 1,200 bed hospital*

*95+% Retention Rate—There is a reason why our customers don't leave*, available at https://www.medlytix.com/impact/ (last accessed on Feb. 24, 2024).

27.     With respect to Medicaid recipients, Medlytix instructs its customers like Defendant ECC to refuse to (1) bill state Medicaid programs and Medicaid MCOs for emergency treatment provided to individuals following an accident and (2) reduce its bill to the amount paid by the appropriate state Medicaid program, as mandated by federal law. 42 U.S.C. § 1396u-2(b)(2)(D) ("Any provider of emergency services that does not have in effect a contract with a Medicaid MCO that establishes payment amounts for services furnished to a beneficiary enrolled

in the entity's Medicaid MCO plan *must accept as payment in full* no more than the amounts (less any payments for indirect costs of medical education and direct costs of graduate medical education) that it could collect if the beneficiary received medical assistance under this subchapter other than through enrollment in such an entity.") (emphasis added).

28.     The accounts of these individuals, at the direction of Medlytix, are segregated from individuals paying out-of-pocket or through commercial insurance. Medlytix performs an analysis of the medical records related to the emergency room visit and then uses a third-party data and analytics service (likely governed by the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*) to identify the tortfeasor and applicable liability insurance and/or UIM coverage. Medlytix performs this service because it requires its customers to provide access to the underlying medical records and billing information for Medicaid recipients. Medlytix directs its customers, including Defendant ECC, to issue bills with inflated charge amounts for services directly to the patient. Medlytix, as detailed below, then generates and issues fraudulent bills to the "appropriate" liability and/or UIM insurers, insisting that these entities pay Defendant ECC directly. Virtually no person seen by Defendant ECC's contracted providers pays these inflated charge amounts, except where Medlytix, in concert with Defendant ECC, extracts payment from a patient's personal injury recovery.[2] This is because the charge amounts on bills issued by Defendant ECC as part of the Fraudulent Billing Schemes are multiples of the reasonable market value of the services provided by Defendant ECC's contract medical professionals.[3]

---

[2] To be clear, self-pay patients and commercial insurers do not pay Defendant ECC amounts anywhere close to the amounts extracted from Medicaid recipients from whom Defendants successfully demand and receives payment out of a personal injury recovery.

[3] As noted above, Defendant ECC operates as a subsidiary of TeamHealth. Litigation in Texas resulted in the public filing of tax returns for two other emergency room staffing subsidiaries of TeamHealth. These tax returns showed that nearly 84 percent of the charges "billed" by these affiliates "were discounted or written off." ProPublica, *How Rich Investors, Not Doctors, Profit*

29.     Then, Medlytix and its customers, including Defendant ECC, jointly and collaboratively work to fraudulently bill tortfeasors' liability insurers and/or insurers providing UIM coverage, bizarrely claiming that the insurers must process and pay the bill issued to the patient.[4] They likewise harangue any attorney representing the Medicaid recipient on her personal injury claim, falsely claiming that federal and state law prohibit submission of a claim to Medicaid (state plan or MCO) and full entitlement to payment of inflated service charges from any recovery on the personal injury claim.

30.     When this scheme succeeds, Medlytix and its customers, including Defendant ECC, jointly share in the proceeds.

31.     The Fraudulent Billing Enterprise continues unabated through the filing of this First Amended Complaint.

### *Ms. Shelton's Experience*

32.     On December 18, 2021, Plaintiff was involved in a motor vehicle collision.

33.     As a result of the collision, Plaintiff sustained bodily injuries.

34.     Plaintiff subsequently filed an injury claim against the at-fault driver.

35.     On the day of the collision, Plaintiff went to the emergency room at Chippenham Hospital in Richmond, Virginia, for treatment of her injuries.

---

*From Marking Up ER Bills*, available at https://www.propublica.org/article/how-rich-investors-not-doctors-profit-from-marking-up-er-bills (last accessed on Feb. 24, 2024).

[4] Plaintiff describes this practice as bizarre because liability and UIM insurers have no obligation to pay any bill issued by Defendant ECC (or any other emergency provider). Using Ms. Shelton as an example, Medlytix claims to have issued what it describes as a "Confidential Third Party Medical Bill and Notice of Unpaid Medical Debt" (the "State Farm Bill") to State Farm. ECF 26-1 at 2. Medlytix issued the State Farm Bill before any litigation commenced, any liability had been established or acknowledged, and on behalf of Defendant ECC directly. But Defendant ECC possessed no claim against the tortfeasor, in its own right or as a subrogee—only Ms. Shelton could assert such a claim.

36.     Dr. Chang, an emergency physician under contract with Defendant ECC, purportedly rendered medical services to Plaintiff at the emergency room for injuries sustained in the December 18, 2021, motor vehicle collision.

37.     At the time of the treatment purportedly rendered by Dr. Nevan Chang, Plaintiff was a Medicaid beneficiary, whose benefits were administered by the MCO, Virginia Premier.

38.     When Plaintiff went to the emergency room, she provided her Virginia Premier Medicaid information to the appropriate healthcare staff. Chippenham Hospital logged Plaintiff's Virginia Premier plan information into its computer systems and made this information available to Defendant ECC.

39.     Plaintiff's charges incurred from Chippenham Hospital and Radiology Associates of Richmond ("Radiology Associates") from her emergency room visit were adjusted and paid by her Virginia Premier Medicaid plan. These providers followed the law and accepted payments by Virginia Premier and refrained from seeking illegal payment amounts. 42 U.S.C. § 1396u-2(b)(2)(D); *see also* 42 U.S.C. § 1396a(a)(25)(C); 42 C.F.R. § 447.15 ("[a] State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual.").

40.     Chippenham Hospital initially generated charges totaling $4,966.00. Pursuant to federal and state law, Chippenham Hospital reduced those charges to $184.58 on December 18, 2021 (the same day Ms. Shelton received treatment). Chippenham Hospital submitted a claim for the services received by Ms. Shelton to Virginia Premier on or about December 22, 2021 and received a payment of $184.58 on December 27, 2021. As required by federal and state law,

Chippenham Hospital accepted Virginia Premier's payment, leaving Ms. Shelton with no balance owed as of December 27, 2021.

41. Radiology Associates initially generated charges totaling $53.93. Pursuant to federal and state law, Radiology Associates reduced those charges to $14.74. Radiology Associates submitted a claim for the services received by Ms. Shelton to Virginia Premier on or about December 30, 2021 and received a payment of $14.74 on January 7, 2022. As required by federal and state law, Radiology Associates accepted Virginia Premier's payment, leaving Ms. Shelton with no balance owed as of January 7, 2022.

42. Because Defendant ECC cannot practice medicine in the Commonwealth of Virginia, it cannot have been the original creditor as to any amount purportedly owed by Plaintiff. *Parikh v. Fam. Care Ctr., Inc.*, 273 Va. 284, 290, 641 S.E.2d 98, 101 (2007) (Virginia law prohibits a non-professional corporation from engaging in the practice of medicine).

43. Defendant ECC never adjusted its inflated charge of $1,177.00 assessed to Ms. Shelton and never submitted a claim to Virginia Premier.

44. Instead, Defendant ECC billed Ms. Shelton $1,177.00, asserting that she owed money for treatment by Dr. Chang and that this money was not paid.

45. Defendant ECC referred the account associated with Ms. Shelton to Medlytix for collection activity only after that account had gone unpaid for more than thirty days. Thus, Defendant ECC considered Plaintiff was in default on paying a consumer debt when it engaged Medlytix for collection activity as to Ms. Shelton's account.

46. On October 25, 2022, Plaintiff settled her underlying personal injury claim.

47. Defendants continued to demand payment for a purported charge of $1,177.00 for the services purportedly rendered at Chippenham Hospital by Dr. Chang.

12

48.     The amount of $1,177.00 claimed by Defendant ECC for Dr. Chang's purported services was significantly inflated for one or more of the following reasons:

A.      The amount was unreasonably high for the services rendered for the reasons detailed above in this First Amended Complaint.

B.      If Dr. Chang was an in-network provider for Plaintiff's Medicaid plan from Virginia Premier, he contractually agreed to limit the amount recoverable from Plaintiff for the services purportedly rendered to her to the negotiated rate for such services offered by Virginia Premier, and Plaintiff was an intended third-party beneficiary of any provider contract with Virginia Premier. The applicable provider contract referenced the entitlement of members of Virginia Premier to multiple rights, including to receive emergency care without prior authorization and to be held harmless (not responsible for the bill or extra costs) for services provided to them for emergency care.

C.      If Dr. Chang was an in-network provider for Plaintiff's Virginia Premier plan, Virginia Code § 8.01-27.5(b) required Dr. Chang and Defendant ECC to submit their claim to Virginia Premier or forfeit their ability to collect any claimed charges from Plaintiff. Further, 42 U.S.C. § 1396a(25)(C) prohibited Dr. Chang and Defendant ECC from seeking payment more than the amount equal to the payment rate payable to the state medical assistance plan provided by the Virginia Department of Medical Assistance. *Id.*

D.      If Dr. Chang was not an in-network provider for Plaintiff's plan from Virginia Premier, federal law prohibited him and Defendant ECC from recovering more than the rate for such services provided for in the state agency fee schedule. 42 U.S.C. § 1396u-2(b)(2)(D); 12 Va. Admin. Code § 30-120-395 ("MCOs shall pay for . . . emergency . . . services to members in compliance with the contract and 42 CFR [§] 438.114. . . .

[E]mergency . . . services provided to" an out-of-network provider "will be reimbursed according to the current Medicaid fee schedule" and "this reimbursement shall be considered payment in full."); 12 Va. Admin. Code § 30-80-30 (requiring emergency providers to accept the *lesser* of the state agency fee schedule or "actual charge (charge to the general public)").

49.     At the time of settlement of Plaintiff's personal injury claim, Defendants falsely claimed that Plaintiff owed $1,177.00 for services purportedly rendered by Dr. Chang.

50.     When Defendant ECC considered Plaintiff's obligation to pay for treatment purportedly provided by Dr. Chang to be in default, Defendant ECC engaged Defendant Medlytix to manage the collection of the phantom $1,177.00 balance on behalf of Defendant ECC. Acting on its own and as agent for Defendant ECC, Defendant Medlytix demanded that Plaintiff's counsel pay the inflated $1,177.00 balance for the services purportedly rendered by Dr. Chang on behalf of Defendant ECC.

51.     On or about January 27, 2022, Medlytix issued the State Farm Bill to seek to collect from Plaintiff, via her personal injury claim, the fraudulent balance of $1,177.00 claimed by Defendant ECC.

52.     On December 8, 2022, Plaintiff's counsel authored a letter addressed to Defendant ECC and emailed and faxed this letter to Defendant Medlytix disputing Plaintiff's responsibility for the balance claimed on behalf of Defendant ECC.

53.     Rather than risk legal action or damage to her credit, Plaintiff subsequently paid the full amount of the inflated charge demanded by Defendants. Plaintiff's counsel sent payment by check, out of the proceeds of Plaintiff's personal injury recovery, to Defendant ECC for $1,177.00 on or about December 14, 2022. Upon receipt of the check, Defendant ECC negotiated it and

deposited it into a bank account owned or controlled by Defendant ECC. On a date better known to Defendants, Defendant ECC shared a portion of this $1,177.00 payment with Defendant Medlytix.

## CLAIMS FOR RELIEF

### COUNT I

### BOTH DEFENDANTS—RICO

54.     Plaintiff incorporates the above stated paragraphs by reference.

55.     **The RICO Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined:

> All natural persons (a) who received services at an emergency room from an emergency provider employed by Defendant ECC in the four years before the filing of this action; (b) who were Medicaid managed care organization plan members at the time of such services; (c) who paid Defendant ECC money in excess of the lesser of the applicable Medicaid fee schedule amount or the actual charge (charge to general public) for the services rendered by the emergency provider employed by Defendant ECC; and (d) whose payment Defendant ECC shared with Medlytix.

> Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

56.     **Numerosity**. Plaintiff alleges that the RICO Class is so numerous that joinder of the claims of all class members is impractical. Defendant ECC staffs numerous emergency rooms throughout the United States with its providers treating hundreds of thousands of individuals per year, so the class size will easily exceed hundreds of individuals. The names and addresses of the class members are identifiable through documents maintained by Defendants, and the class members may be notified of the pendency of this action by publication or mailed notice.

57.     **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions

include, among other things: (a) whether federal and state law prohibited Defendant ECC from demanding and collecting payments in excess of the lesser of the applicable Medicaid fee schedules amount or the actual charge (charge to the general public); and (b) whether Defendants are entitled to retain money from excessive payments by RICO class members.

58. **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of federal and state law for Defendant's demand and collection of charges in excess of the legally permitted amounts. This claim challenges the ability of Defendants to collect money for services in excess of the amounts set by law for such services. The recovery of class damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but modest. In addition, Plaintiff is entitled to the relief under the same causes of action as the other members of the RICO Class.

59. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted those responsibilities.

60. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

A. As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendants' conduct,

using individual prosecution to obtain the modest damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

61.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Defendants' conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

62.    Defendants use income from racketeering activity to operate an enterprise engaged in in interstate commerce in violation of 18 U.S.C. § 1962(a).

63.    Defendants are each legally distinct entities.

64.    Defendants each perform independent actions within the enterprise.

65.    Defendant ECC, through contracted medical professionals, provides the medical services.

66.    Defendants agree that Medlytix will integrate its victim identification and collection techniques into the operations of Defendant ECC, and Defendant ECC will share confidential patient health information and records with Medlytix to allow Medlytix to identify potential victims and facilitate collection activity against them.

67.     Defendants work together in an enterprise which provides medical services to individual Medicaid beneficiaries and then extracts inflated payments through multipronged collection efforts directed at individual Medicaid beneficiaries and their legal counsel and liability and UIM insurers.

68.     The Fraudulent Billing Enterprise is an association-in-fact consisting of Defendant ECC and Defendant Medlytix.

69.     Both Defendants play a different role while working toward a common purpose: extracting profits from fraudulent, inflated service charges collected from Medicaid beneficiaries who seek emergency treatment after accidents.

70.     The Fraudulent Billing Enterprise is an ongoing and continuing association-in-fact consisting of Defendants who are and have been associated for the common and/or shared purposes of setting, administering, and deriving unlawful and fraudulent emergency care charges from Medicaid beneficiaries receiving post-accident emergency treatment. The Fraudulent Billing Enterprise has existed continuously for at least several years.

71.     The enterprise performs its actions willfully, and with knowledge that Medicaid beneficiaries pay inflated, fraudulent charges out of the proceeds of personal injury claim recoveries. Defendants represented to Plaintiff and the RICO Class members that the charges claimed and collected are lawful. In fact, Defendants falsely asserted to Plaintiff and the RICO Class members that federal and state law mandates collection of Defendant ECC's exaggerated charges for the services purportedly provided.

72.     This scheme is fraudulent. Even apart from the federal and state laws requiring Defendants to seek to collect only specified charges, the charges billed and collected by

Defendants from Plaintiff and the RICO Class members are not reasonable approximations of the actual value of the services purportedly provided.

73.     The Fraudulent Billing Enterprise maintains systemic linkages because there are contractual relationships, financial ties, and continuing coordination of activities between Defendants.

74.     At all relevant times, Defendants have been aware of the enterprise's conduct, have acted as knowing and willing participants in that conduct, and have reaped illegal profits from that conduct. Because Defendants share in ill-gotten profits, both benefit from the enterprise's operations.

75.     The Fraudulent Billing Enterprise knowingly makes material misrepresentations and omissions in furtherance of the fraudulent scheme regarding:

> A.     The inability to claim reimbursement from Medicaid MCOs for the services provided;

> B.     The financial responsibility of Medicaid beneficiaries for the services provided;

> C.     The responsibility of liability and UIM insurers for the services provided;

> D.     The inflated nature of the charges associated with the services provided; and

> E.     The lack of any basis to collect those inflated charges from the personal injury recoveries of Medicaid beneficiaries.

76.     The impacts of the Fraudulent Billing Enterprise remain in place, i.e., the fraudulent billing and collections activity continues unabated.

77.     The Fraudulent Billing Enterprise engaged in and affects interstate commerce by conducting the following activities across state boundaries: the sale, purchase, contracting for,

and/or administration of the medical services; the generation of fraudulent charges for medical services purportedly provided; and/or the transmission and/or receipt of invoices, billing statements, debt collection notices, and payments related to the use or administration of the medical services purportedly provided.

78.     The Fraudulent Billing Enterprise participated in the administration and billing of medical services to thousands of Medicaid beneficiaries located throughout the United States. The enterprise likewise fraudulently billed thousands of Medicaid beneficiaries for these medical services.

79.     The Fraudulent Billing Enterprise's illegal conduct and wrongful practices were carried out by an array of employees and independent contractors, working across state boundaries. The enterprise necessarily relied upon frequent transfers of documents, information, products, and funds through the U.S. mails and interstate wire facilities.

80.     In particular, the Fraudulent Billing Enterprise transmitted fraudulent bills, claims, and communications and sought payment from Medicaid beneficiaries and their legal counsel and liability and UIM insurers using the U.S. mails and interstate wire facilities.

81.     The nature and pervasiveness of the Fraudulent Billing Enterprise's scheme, which was orchestrated out of the corporate headquarters of Defendants, necessarily required those headquarters to communicate directly and frequently through the U.S. mails and interstate wire facilities with each other and numerous affiliated or connected individuals and entities.

82.     Most of the precise dates of the enterprise's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) cannot be alleged without access to Defendants' books and records. However, Plaintiff can generally describe the

occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts furthered the fraudulent billing scheme.

83.     Defendant ECC issued a bill to Ms. Shelton dated January 26, 2022 which falsely claimed an outstanding charge of $1,177.00 for the services purportedly provided by Dr. Chang. The bill identified Ms. Shelton's home address. Defendant Medlytix submitted, by mail or wire, a fraudulent bill to State Farm on or about January 27, 2022. In August 2022, Defendant Medlytix falsely represented to Ms. Shelton's legal counsel that Ms. Shelton remained responsible for an outstanding, inflated charge of $1,177.00.

84.     In addition, Plaintiff alleges that every bill and communication Defendants sent as to a member of the RICO Class members fraudulently demanded payment on amounts that Defendants knew they could not legally recover. Each of these bills and communications is a predicate act of mail and/or wire fraud, and the precise timing of these predicate acts will be revealed in Defendants' books and records.

85.     The Fraudulent Billing Enterprise communicated with Plaintiff and the RICO Class members, lawyers for Plaintiff and the RICO Class members and their staff members and contractors, and liability and UIM insurers, through the U.S. mails and interstate wire facilities, fraudulently claiming entitlement to payment of illegal, inflated charges for purported medical services.

86.     Defendants each conducted or participated, directly or indirectly, in the conduct of the Fraudulent Billing Enterprise's affairs, through the provision of medical services, generation of fraudulent charges and bills, and collection activity on the fraudulent charges and bills.

87.     Defendants regularly and continuously receive illegally collected payments through the U.S. mail and interstate wire facilities. As with Ms. Shelton, whenever Defendant ECC

received payment from or on behalf of RICO Class members, it shares a portion of such payments with Defendant Medlytix.

88.     Through the Fraudulent Billing Enterprise, Defendants conducted or participated, directly or indirectly, in acts of mail fraud and wire fraud by misrepresenting through the U.S. mail and interstate wire facilities the fraudulent nature of charges and bills generated for medical services and entitlement to collect on such fraudulent charges and bills.

89.     Defendants' violations of federal and state law and their pattern of racketeering activity have directly and proximately injured the Plaintiff and the RICO Class members in their business or property. Plaintiff and the RICO Class members have overpaid and been overbilled for millions of dollars based on the enterprise's fraudulent charges and collection activity.

90.     Plaintiff and each member of the RICO Class are entitled to recover three times the damages that they have sustained, as well as reasonable attorneys' fees and court costs.

### COUNT II

### DEFENDANT ECC—BREACH OF CONTRACT

91.     Plaintiff incorporates the above stated paragraphs before **CLAIMS FOR RELIEF** by reference.

92.     Defendant ECC, through Dr. Chang or on its own, entered into a provider agreement with Virginia Premier.

93.     Virginia Premier enters into its provider agreements to provide its MCO members access to those providers at negotiated rates.

94.     This provider agreement specifically contemplated the provision of services, in accordance with that agreement, to Virginia Premier plan members like Plaintiff.

95.     Defendant ECC, on its own or through its contacted providers, specifically agreed in the provider agreement(s) with Virginia Premier to provide services to plan members like Plaintiff at specific reimbursement rates set out by Virginia Premier.

96.     The operative provider agreements with Virginia Premier limited its reimbursement rates for the services purportedly provided by Dr. Chang to a fraction of the $1,177.00 claimed by Defendant ECC as Plaintiff's defaulted obligation.

97.     The provider agreements with each MCO under which Defendant ECC or its contracted medical professionals provided services limited the reimbursement rates for services purportedly provided to Medicaid MCO plan members to a fraction of the amounts claimed by Defendant ECC as the obligations of members of the Breach of Contract Class set forth below. These provider agreements likewise recognized the rights of MCO plan members to receive emergency care without prior authorization and to be held harmless (not responsible for the bill or extra costs) for services provided to them for emergency care.

98.     **The Breach of Contract Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined:

> All natural persons who (a) received services at an emergency room from an emergency provider employed by Defendant ECC in the five years before the filing of this action; (b) were Medicaid managed care organization plan members at the time of such services; and (c) paid Defendant ECC money in excess of the negotiated rate(s) for such service(s) provided for by the applicable managed care organization provider agreement.

> Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

99.     **Numerosity**. Plaintiff alleges that the Breach of Contract Class is so numerous that joinder of the claims of all class members is impractical. Defendant ECC staffs numerous emergency rooms throughout the United States with its providers treating hundreds of thousands

of individuals per year, so the class size will easily exceed hundreds of individuals. The names and addresses of the class members are identifiable through documents maintained by Defendant ECC, and the class members may be notified of the pendency of this action by publication or mailed notice.

100.    **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant ECC's contracts with MCOs inure to the benefit of patients receiving emergency services from providers employed by Defendant ECC; and (b) whether Defendant ECC's contracts with MCOs limited the reimbursement rate for emergency services.

101.    **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of a standard provider agreement entered into by Defendant ECC (or its contracted medical professionals) with Medicaid MCOs. This claim challenges the ability of Defendant ECC to collect money in excess of the reimbursement rates provided for in these standard contracts. Plaintiff seeks recovery of funds paid in excess of the reimbursement rates permitted by the standard provider agreements.  The recovery of class contract damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but modest. In addition, Plaintiff is entitled to the relief under the same causes of action as the other members of the Breach of Contract Class.

102.    **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against

consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted those responsibilities.

103.   Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

A.   As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendant's conduct, using individual prosecution to obtain the modest damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

B.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Defendant ECC's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

104.    Defendant ECC breached its provider agreements, as to which Plaintiff and the members of the Breach of Contract Class were intended third-party beneficiaries, by demanding and collecting charges for services exceeding the negotiated amounts for such services set forth in its provider agreements.

105.    Plaintiff and each member of the Breach of Contract Class are entitled to recover damages for Defendant ECC's breaches of its provider agreements.

**COUNT IV**

**BOTH DEFENDANTS—UNJUST ENRICHMENT**

106.    Plaintiff incorporates the paragraphs set forth above before **CLAIMS FOR RELIEF** by reference.

107.    **The Unjust Enrichment Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined:

> All natural persons (a) who received services at an emergency room from an emergency provider employed by Defendant ECC in the three years before the filing of this action; (b) who were Medicaid managed care organization plan members at the time of such services; (c) who paid Defendant ECC money in excess of the lesser of the applicable Medicaid fee schedule amount or the actual charge (charge to general public) for the services rendered by the emergency provider employed by Defendant ECC; and (d) whose payment Defendant ECC shared with Medlytix.

> Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

108.    **Numerosity**. Plaintiff alleges that the Unjust Enrichment Class is so numerous that joinder of the claims of all class members is impractical. Defendant ECC staffs numerous emergency rooms with its providers treating hundreds of thousands of individuals per year, so the class size will easily exceed hundreds of individuals. Defendant Medlytix acts in concert with Defendant ECC to collect unjust and unlawful charges from thousands of patients treated by

Defendant ECC's contracted providers each year. The names and addresses of the class members are identifiable through documents maintained by Defendants, and the class members may be notified of the pendency of this action by publication or mailed notice.

109. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant ECC's contracts with MCOs inure to the benefit of patients receiving emergency services from providers employed by Defendant ECC; (b) whether federal and state law prohibited Defendant ECC from demanding and collecting payments in excess of the lesser of the applicable Medicaid fee schedule amount or the actual charge (charge to the general public); and (c) whether Medlytix is entitled to retain the money it received from Defendant ECC from excessive payments by putative class members.

110. **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of federal and state law for Defendant's demand and collection of charges in excess of the legally permitted amounts. This claim challenges the ability of Defendants to collect money for services in excess of the amounts set by law for such services. The recovery of class unjust enrichment damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but modest. In addition, Plaintiff is entitled to the relief under the same causes of action as the other members of the Unjust Enrichment Class.

111. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause

them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted those responsibilities.

112.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

B.      As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendant's conduct, using individual prosecution to obtain the modest damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

C.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Defendant's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

113.    As a result of its improper demand and collection of impermissible payments in excess of the amount allowed by contract and/or under federal and state law, Defendants obtained monies which rightfully belong to Plaintiff and the members of the Unjust Enrichment Class.

114.    Defendants appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiff and each member of the Unjust Enrichment Class who tendered excess payment amounts to Defendant ECC, which Defendant ECC then shared with Medlytix, despite contracts and/or federal and state laws prohibiting collections of such payment amounts.

115.    It would be inequitable and unjust for Defendants to retain wrongfully obtained payments from Plaintiff and the Unjust Enrichment Class.

116.    Defendants' retention of these wrongfully obtained payments would violate the fundamental principles of justice, equity, and good conscience.

117.    Plaintiff and the Unjust Enrichment Class members are entitled to restitution of the payments unjustly obtained plus interest.

### COUNT V

### DEFENDANT ECC—BREACH OF IMPLIED CONTRACT

118.    Plaintiff incorporates the paragraphs set forth above before **CLAIMS FOR RELIEF** by reference.

119.    **The Implied Contract Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined:

> All natural persons who (a) received services at an emergency room from an emergency provider employed by Defendant ECC in the three years before the filing of this action; (b) were Medicaid managed care organization plan members at the time of such services; and (c) paid Defendant ECC money in excess of the reasonable compensation for the services provided by the emergency provider employed by Defendant ECC.

Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

120. **Numerosity**. Plaintiff alleges that the Implied Contract Class is so numerous that joinder of the claims of all class members is impractical. Defendant ECC staffs numerous emergency rooms with its providers treating hundreds of thousands of individuals per year, so the class size will easily exceed hundreds of individuals. The names and addresses of the class members are identifiable through documents maintained by Defendant ECC, and the class members may be notified of the pendency of this action by publication or mailed notice.

121. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether implied contracts existed for the services performed by emergency service providers employed by Defendant ECC; and (b) whether the amounts collected by Defendant ECC for emergency provider services were reasonable.

122. **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a breach of implied contract for Defendant ECC's demand and collection of charges in excess of the reasonable amount for the services provided. This claim challenges the ability of Defendant ECC to collect money for services in excess of the reasonable amount (under law) for such services. The recovery of class damages for breach of implied contracts is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but modest. In addition, Plaintiff is entitled to the relief under the same causes of action as the other members of the Breach of Implied Contract Class.

123.   **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted those responsibilities.

124.   Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

A.   As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendant's conduct, using individual prosecution to obtain the modest damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

B.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Defendant's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class

wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

125.     Under Virginia law, "[w]here services is performed by one, at the instance and request of another, and . . . nothing is said between the parties as to compensation for such service, the law implies a contract, that the party who performs the services shall be paid a reasonable compensation therefore." *Mongold v. Woods*, 278 Va. 196, 203, 677 S.E.2d 288 (2009) (quoting *Rea's Adm'x v. Trotter*, 67 Va. (26 Gratt.) 585, 592 (1875)). Courts outside Virginia also recognize this bedrock legal principle. *See, e.g.*, *Doe v. HCA Health Servs. of Tenn.*, 46 S.W. 3d 191 (Tenn. 2001).

126.     Defendant ECC breached its implied contracts with Plaintiff and the members of the Breach of Implied Contract Class, by demanding and collecting charges for services exceeding "the reasonable value of the services provided." *T. Musgrove Constr. Co., Inc. v. Young*, 298 Va. 480, 486, 840 S.E.2d 337, 341 (2020); *see also Doe*, 46 S.W. 3d 191.

127.     Plaintiff and each member of the Implied Breach of Contract Class are entitled to recover damages for Defendant ECC's breaches of its implied contracts with them.

## COUNT VI

### DEFENDANT ECC—VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT

128.     Plaintiff incorporates the above stated paragraphs by reference.

129.     Plaintiff incorporates the paragraphs set forth above before **CLAIMS FOR RELIEF** by reference.

130.     **The VCPA Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined:

All natural persons who (a) received services at an emergency room from an emergency provider employed by Defendant ECC; (b) were Medicaid managed

care organization plan members in Virginia at the time of such services; and (c) paid Defendant ECC any amount of money in the two years before the filing of this action for the services provided by the emergency provider employed by Defendant ECC.

Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

131. **Numerosity**. Plaintiff alleges that the VCPA Class is so numerous that joinder of the claims of all class members is impractical. Defendant ECC staffs numerous emergency rooms in Virginia with its providers treating thousands of individuals per year, so the class size will easily exceed hundreds of Virginians. The names and addresses of the class members are identifiable through documents maintained by Defendant ECC, and the class members may be notified of the pendency of this action by publication or mailed notice.

132. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant ECC was legally required, under Virginia Code § 8.01-27.5 to submit claims to Medicaid MCOs for emergency provider services; (b) whether Defendant ECC submitted claims to Medicaid MCOs for emergency providers; and (c) whether Defendant ECC illegally collected payments for services that should have been reimbursed based on claims submitted to Medicaid MCOs.

133. **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of the VCPA for Defendant ECC's demand and collection of charges disallowed by the operation of Virginia Code § 8.01-27.5. This claim challenges the ability of Defendant ECC to collect money for services when it failed to submit claims to Medicaid MCOs

for such services. The recovery of class VCPA actual, statutory, and treble damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but modest. In addition, Plaintiff is entitled to the relief under the same causes of action as the other members of the VCPA Class.

134. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted those responsibilities.

135. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

A. As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendant ECC's conduct, using individual prosecution to obtain the modest damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

B. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Defendant ECC's

conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

136.    Virginia Code § 8.01-27.5 prescribes the duty of in-network health care providers to submit claims to health insurers.

137.    Medicaid health insurance is explicitly contemplated in Virginia Code § 8.01-27.5(A), which reads: "Health care policy includes coverages issued pursuant to… Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (Medicaid) . . . ."

138.    Virginia Code § 8.01-27.5(b) provides, in part: "[a]n in-network provider that provides health care services to a covered patient shall submit its claim to the health insurer for the health care services . . . provided that the covered patient provides the in-network provider with" the patient's health insurance information. If a provider "does not submit its claim to the health insurer in accordance with the requirements of this subsection, then (i) the covered patient shall have no obligation to pay for health care services for which the in-network provider was required to submit its claim, (ii) the in-network provider shall not have the benefit of liens provided by §§ 8.01-66.2 and 8.01-66.9 with regard to health care services for which the in-network provider was required to submit its claim, and (iii) the in-network provider shall be prohibited from recovering payment for any of the health care services for which it was required to submit its claim from an insurer providing medical expenses benefits to the covered patient under a policy of motor vehicle liability insurance pursuant to § 38.2-2201 . . . ."

139.     Put simply, for the purposes of this action, under Virginia Code § 8.01-27.5(b), the patient is not financially responsible for the charges incurred if the provider fails to timely submit the charge to the patient's health insurance carrier.

140.     Virginia Code § 8.01-27.5 defines an "in-network provider" as one that "is employed by or has entered into a provider agreement with the health insurer that has issued the health care policy or is a participating provider with such health insurer, under which agreement or conditions of participation the health care provider has agreed to provide health care services to covered patients."

141.     Upon information and belief, Defendant ECC is an "in-network provider" with Virginia Premier.

142.     When Plaintiff and members of the VCPA Class went to emergency rooms and received services from emergency providers employed by Defendant ECC, their Medicaid MCO coverage was ascertained by Defendant ECC.

143.     Under Virginia Code § 8.01-27.5, Defendant ECC was required to submit its charges as to Plaintiff and the VCPA Class to the appropriate Medicaid MCO providing coverage to such individuals. Nothing in federal or state law prohibited Defendant ECC from submitting its claims to the appropriate Medicaid MCO.

144.     Defendant ECC never submitted claims to the appropriate Medicaid MCOs, as to Plaintiff and the VCPA Class, because it believed that it could extract excessive charges if it never submitted claims to these MCOs.

145.     Virginia Code § 8.01-27.5 prohibited Defendant ECC from collecting any amounts from the Plaintiff and the VCPA Class.

146.    Virginia Code § 8.01-27.5 provides that "[a]ny knowing violation of the provisions of this section shall constitute a prohibited practice in accordance with § 59.1-200 and shall be subject to any and all of the enforcement provisions of the Virginia Consumer Protection Act (§59.1-196 et seq.)."

147.    Virginia Code § 59.1-200(A)(67) provides that a knowing violation of § 8.01-27.5 is a fraudulent and unlawful act.

148.    Defendant ECC is a seller regulated by the VCPA.

149.    Plaintiff and the class she seeks to represent received medical treatment as part of a consumer transaction regulated by the VCPA.

150.    Virginia Code § 59.1-204(A) provides that "[a]ny person who suffers a loss as the result of a violation of this chapter shall be entitled to initiate an action to recover actual damages or $500, whichever is greater. If the trier of fact finds that the violation was willful, it may increase damages to an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater." *Id.*

151.    Virginia Code § 59.1-204(B) provides that the person suffering a loss may also be awarded reasonable attorneys' fees and court costs.

152.    Defendant ECC was aware of its obligation to submit Plaintiff's charge to her health insurance carrier.

153.    Defendants knowingly and willfully failed to submit Plaintiff and VCPA Class members' charges to their health insurance carriers.

154.    Plaintiff and the VCPA Class paid money to Defendant ECC, thereby suffering a loss according to Virginia Code § 59.1-204(A), and they are entitled to recover the greater of their actual damages or $500 in statutory damages from Defendant ECC.

155.     Defendant ECC willfully violated the VCPA and is liable, as to Plaintiff and each member of the VCPA class, for the greater of three times the actual damages incurred or $1,000, as well as reasonable attorneys' fees and court costs.

## COUNT VII

### DEFENDANT MEDLYTIX – VIOLATIONS OF THE FDCPA

156.     Plaintiff incorporates the above stated paragraphs by reference.

157.     **The FDCPA Class**. Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action individually and on behalf of a class of which she is a member and initially defined:

> All natural persons (a) who received services at an emergency room from an emergency provider employed by Defendant ECC; (b) who were Medicaid managed care organization plan members at the time of such services; (c) as to whom Defendant Medlytix engaged in collection communication directly or indirectly, including third-party communications, after engagement by Defendant ECC for collection action more than thirty days after the emergency room services; (d) who paid Defendant ECC any amount of money in the year before the filing of this action in excess of the amount allowed by contract or law for the services provided by the emergency provider employed by Defendant ECC; and (e) whose payment Defendant ECC shared with Medlytix.

> Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

158.     **Numerosity**. Plaintiff alleges that the FDCPA Class is so numerous that joinder of the claims of all class members is impractical. Defendant ECC staffs numerous emergency rooms with its providers treating hundreds of thousands of individuals per year, so the class size will easily exceed hundreds of individuals. Defendant Medlytix acts in concert with Defendant ECC to collect unjust and unlawful charges from thousands of patients treated by Defendant ECC's contracted providers each year. The names and addresses of the class members are identifiable through documents maintained by Defendant Medlytix, and the class members may be notified of the pendency of this action by publication or mailed notice.

38

159. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant ECC was prohibited by law or contract from collecting specific amounts of money from Plaintiff and the FDCPA Class members; (b) whether Defendant Medlytix demanded money on behalf of Defendant ECC in excess of the amounts allowed by law or contract;  and (c) whether Defendant ECC collected amounts of money in excess of the amounts permitted by law or contract following Medlytix collection efforts.

160. **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of the FDCPA for Defendant ECC's demand and collection of charges disallowed by the operation law or contract. This claim challenges the ability of Defendant Medlytix to seek to collect money for services by Defendant ECC. The recovery of class FDCPA actual or statutory damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but modest. In addition, Plaintiff is entitled to the relief under the same causes of action as the other members of the FDCPA Class.

161. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted those responsibilities.

162. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

A.      As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendant Medlytix's conduct, using individual prosecution to obtain the modest damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

B.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Defendant Medlytix's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

163.    As set forth above, Defendant Medlytix is a debt collector as defined in the FDCPA.

164.    Defendant Medlytix violated the FDCPA by falsely demanding and seeking to collect, on behalf of Defendant ECC, amounts not permitted to be collected by contract or law. 15 U.S.C. § 1692e.

40

165.    Defendant Medlytix violated the FDCPA by collecting amounts not permitted to be collected by contract or law, including as to Plaintiff within the year preceding the filing of her Complaint. 15 U.S.C. § 1692e.

166.    Defendant Medlytix receives a portion of the amounts illegally collected by Defendant ECC following Medlytix's collection efforts.

167.    Plaintiff and the FDCPA Class members were injured as a result of Defendant Medlytix's violations of the FDCPA because they paid amounts to Defendant ECC not allowed by contract or law as a result of such violations, and Medlytix received a portion of the amounts paid.

168.    Defendant Medlytix is liable to Plaintiff and the FDCPA Class members for their actual damages, statutory damages, costs, and attorney's fees.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court enter judgment on behalf of themselves and the classes they seek to represent against Defendants for:

A.    Certification for this matter to proceed as a class action;

B.    Actual, treble, and statutory damages as pleaded herein;

C.    Attorneys' fees, litigation expenses, and costs of suit; and

D.    Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**JOHNEISHA SHELTON**

_/s/ Drew D. Sarrett_____
Drew D. Sarrett (VSB No. 81658)
**Consumer Litigation Associates, P.C.**
620 East Broad Street, Suite 300
Richmond, Virginia 23219

P: (804) 905-9900
F: (757) 930-3662
E: drew@clalegal.com

Gianni A. Puglielli (VSB No. 97715)
Joshua Voelkel (VSB No. 95049)
**GEOFF MCDONALD & ASSOCIATES, P.C.**
8720 Stony Point Parkway, Suite 250
Richmond, Virginia 23235
P: (804) 888-8888
F: (804) 359-5426
E: gpuglielli@mcdonaldinjurylaw.com
   jvoelkel@mcdonaldinjurylaw.com


*Counsel for Plaintiff*