IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOHNEISHA SHELTON,

      Plaintiff,

    v.                            Civil Action No. 3:23cv844

EMERGENCY COVERAGE
CORPORATION,

      and

MEDLYTIX, LLC,

      Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on:  (1) Defendant Medlytix, LLC's ("Medlytix") Motion to Dismiss the First Amended Complaint for Failure to State a Claim Under Rule 12(b)(6), (ECF No. 41), and (2) Defendant Emergency Coverage Corporation's ("ECC") Motion to Dismiss Plaintiff's First Amended Complaint, (ECF No. 43) (collectively, the "Motions" or "Motions to Dismiss").[1]  Plaintiff Johneisha Shelton ("Ms. Shelton") responded in opposition to both Motions, (ECF Nos. 50, 51), and Medlytix and ECC each filed a reply brief, (ECF Nos. 53, 54).

The matter is ripe for disposition.  The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

For the reasons articulated below, the Court will grant both Motions to Dismiss. (ECF Nos. 41, 43.)

### I.  Factual and Procedural Background

**A.  Allegations in the Amended Complaint[2]**

**1.  Ms. Shelton's Car Accident and the Resulting Medical Bills**

Ms. Shelton is a resident of Virginia who receives Medicaid benefits administered by Virginia Premier, a state Managed Care Organization ("MCO").  (ECF No. 34 ¶¶ 1, 17, 37.)  On December 18, 2021, Ms. Shelton was injured in a car accident.  (ECF No. 34 ¶¶ 32–33.)  The same day, Ms. Shelton "went to the emergency room at Chippenham Hospital in Richmond, Virginia, for treatment of her injuries."  (ECF No. 34 ¶ 35.)

At the hospital, "Dr. [Nevan] Chang, an emergency physician under contract with Defendant [Emergency Coverage Corporation][3], purportedly rendered medical services to [Ms. Shelton]."  (ECF No. 34 ¶¶ 36–37.)  While in the emergency room, Ms. Shelton provided her Virginia Premier Medicaid information to the staff at Chippenham Hospital.  (ECF No. 34 ¶ 38.)

As a result of her emergency room visit, Ms. Shelton incurred charges from Chippenham Hospital and Radiology Associates of Richmond ("Radiology Associates").  (ECF No. 34 ¶ 39.)  Chippenham Hospital "generated charges totaling $4,966.00" but

---

[2] In considering the Motions to Dismiss, (ECF Nos. 41, 43), the Court will assume the well-pleaded factual allegations in the Amended Complaint to be true and will view them in the light most favorable to Ms. Shelton.  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

[3] ECC is a corporation that administers medical treatment through contracted emergency providers.  (ECF No. 34 ¶¶ 15, 18.)

"[p]ursuant to federal and state law" reduced the charges on that same day, and "submitted a claim . . . to Virginia Premier", Virginia's MCO for Medicaid claims, for "$184.58" which it later received. (ECF No. 34 ¶ 40.)  Similarly, Radiology Associates generated charges of $53.93 but submitted and received payment from Virginia Premier for $14.74 pursuant to federal and state law. (ECF No. 34 ¶ 41.)

Ms. Shelton also incurred a charge from ECC for $1,177.00 for her treatment by Dr. Chang, who worked for ECC, not Chippenham Hospital. (ECF No. 34 ¶ 44.)  Unlike Chippenham Hospital, ECC did not submit a claim to the Commonwealth's MCO for Medicaid, Virginia Premier, but billed Ms. Shelton directly.  (ECF No. 34 ¶ 43–44.)  The Amended Complaint states that "[t]he amount of $1,177.00 claimed by Defendant ECC for Dr. Chang's purported services was significantly inflated[,]" amounting to "more than fourteen times the amount ECC routinely accepted from Medicaid in 2021 for the same services", "more than nine times the amount received" by ECC for Medicare, and "more than six times the amount commercial insurers typically paid" in 2021. (ECF No. 34 ¶¶ 6, 48.)

### 2.    The Fraudulent Scheme

The Amended Complaint states that this "grossly inflated figure" was dictated by the "private equity colossus, Blackstone, which owns TeamHealth, Inc., ("TeamHealth") the parent company of ECC." (ECF No. 34 ¶ 4.)  In 2019, TeamHealth admitted in a letter to the United States Senate, that "its average cost per encounter was only $150", yet its prices, based on the amount billed to uninsured patients in 2019 "averaged $918 per

3

encounter."[4]  (ECF No. 34 ¶ 4.)  "TeamHealth dictates the prices of Defendant ECC (and its other subsidiary subscriber groups)."  (ECF No. 34 ¶ 4.)

For its part, Defendant Medlytix is a limited liability company that "markets itself as providing 'revenue and reimbursement intelligence' to '[h]ospitals, physician groups[,] and other providers' who 'routinely miss out on a portion of third-party payments from commercial insurance carriers and government aid.'"  (ECF No. 34 ¶¶ 19, 21 (citation omitted).)  Medlytix advertises that the payments it obtains for its customers—including ECC—are "eight times what Medicaid pays and more than double the reimbursement available from commercial insurers like Blue Cross Blue Shield."  (ECF No. 34 ¶ 22.)  "Medlytix directs its customers, including Defendant ECC, to issue bills with inflated charge amounts for services directly to the patient."  (ECF No. 34 ¶ 28.)  Medlytix "exerts control over the way frontline providers like Dr. Chang interact with patients and input and code information" resulting in billing records that "are used to extract inflated payments from patients like Ms. Shelton."  (ECF No. 34 ¶ 25.)

This is described as an "association-in-fact" between ECC and Medlytix that supports a "Fraudulent Billing Enterprise."  (ECF No. 34 ¶ 68.)  ECC and Medlytix "have been associated for the common and/or shared purposes of setting, administering, and deriving unlawful and fraudulent emergency care charges from Medicaid beneficiaries receiving post-accident emergency treatment."  (ECF No. 34 ¶ 70.)  As part of this scheme, "Defendants falsely asserted to Plaintiff and the RICO class members that federal

---

[4] The Amended Complaint does not purport to quote the 2019 letter.  But the Court must assume these allegations are true.

and state law mandates the collection of Defendant ECC's exaggerated charges for the services purportedly provided." (ECF No. 34 ¶ 71.)

"The Defendants employ their scheme in multiple states, annually gouging numerous consumers." (ECF No. 34 ¶ 7.) They "weaponiz[e] Medicaid's third-party liability requirements to extract inflated payments from Medicaid beneficiaries who seek emergency treatment after accidents" in part by sending "fraudulent bills to Medicaid recipients and their lawyers as well as . . . [to] insurers". (ECF No. 34 ¶ 8.) "When this scheme succeeds, Medlytix and . . . ECC[] jointly share in the proceeds." (ECF No. 34 ¶ 30.) Defendants "fraudulently demanded payments on amounts that [they] knew they could not legally recover . . . . Each of these bills and communications is a predicate act of mail and/or wire fraud, and the precise timing of these predicate acts will be revealed in Defendants' books and records." (ECF No. 34 ¶ 84.)

The Amended Complaint states that "[t]here are at least 100 members in the proposed class [and] the aggregate claims of the individual proposed class members exceed the sum or value of $5,000,000.00 . . . and Plaintiff and many, if not most, members of the proposed classes are citizens of states different from the Defendants." (ECF No. 34 ¶ 13.)

The Amended Complaint alleges that this scheme violates federal and state law. (ECF No. 34 ¶ 9.) "Medlytix instructs it customers like Defendant ECC to refuse to (1) bill state Medicaid programs and Medicaid MCOs for emergency treatment provided to individuals following an accident and (2) reduce its bill to the amount paid by the appropriate state Medicaid program, as mandated by federal law." (ECF No. 34 ¶ 27.) These inflated charges run counter to findings by "courts throughout the country"

5

recognizing that "providers who have not reached an agreement on price with patients, like any other service provider, may only recover the reasonable market value of their services." (ECF No. 34 ¶ 10.)

### 3.    ECC's and Medlytix's Collection of Ms. Shelton's Bill

After the car accident, Ms. Shelton "filed an injury claim against the at-fault driver." (ECF No. 34 ¶ 34.) "On October 25, 2022, [Ms. Shelton] settled her underlying personal injury claim." (ECF No. 34 ¶ 46.)

After Ms. Shelton's "account had gone unpaid for more than thirty days", "ECC referred the account associated with Ms. Shelton to Medlytix for collection activity." (ECF No. 34 ¶ 45.) Ms. Shelton alleges that "ECC considered [that she] was in default on paying a consumer debt when it engaged Medlytix for collection activity." (ECF No. 34 ¶ 45.) According to the Amended Complaint, "[a]t the time of settlement of [her] personal injury claim, [ECC and Medlytix]" asserted that Ms. Shelton "owed $1,177.00 for services purportedly rendered by Dr. Chang." (ECF No. 34 ¶ 49.) "Medlytix demanded that [Ms. Shelton's] counsel pay the inflated $1,177.00 balance[.]" (ECF No. 34 ¶ 50.)

"On or about January 27, 2022, Medlytix issued the State Farm Bill to seek to collect from [Ms. Shelton], via her personal injury claim, the fraudulent balance of $1,177.00 claimed by [] ECC." (ECF No. 34 ¶ 51.) "In August 2022, [] Medlytix falsely represented to Ms. Shelton's legal counsel that Ms. Shelton remained responsible for an outstanding, inflated charge of $1,177.00." (ECF No. 34 ¶ 83.) On December 8, 2022, Ms. Shelton's counsel "emailed and faxed" a letter to Medlytix, addressed to ECC, "disputing [Ms. Shelton's] responsibility for the balance claimed on behalf of [] ECC." (ECF No. 34 ¶ 52.)

6

However, Ms. Shelton "subsequently paid the full amount of the inflated charge demanded by Defendants." (ECF No. 34 ¶ 53.) On December 14, 2022, "[Ms. Shelton's] counsel sent payment by check, out of the proceeds of [Ms. Shelton's] personal injury recovery, to [] ECC for $1,177.00[.]" (ECF No. 34 ¶ 53.) Plaintiff alleges that "[o]n a date better known to Defendants, [] ECC shared a portion of this $1,177.00 payment with [] Medlytix." (ECF No. 34 ¶ 53.)

### B.    Procedural Background

On December 13, 2023, Ms. Shelton filed her original Complaint. (ECF No. 1.) On February 26, 2024, Ms. Shelton, the sole named plaintiff, filed her Amended Complaint as a Class Action on behalf of those similarly situated. (ECF No. 34.) In her Amended Complaint, Ms. Shelton asserts six class action counts:

| | |
|---|---|
| **Count I:** | Racketeer Influenced and Corrupt Organization Act (RICO) pursuant to 418 U.S.C. § 1962(a) (against both Defendants) |
| **Count II:** | Breach of Contract pursuant to Virginia common law (against ECC) |
| **Count IV[5]:** | Unjust Enrichment under Virginia common law (against both Defendants) |
| **Count V:** | Breach of Implied Contract under Virginia common law (against ECC) |
| **Count VI:** | Violations of the Virginia Consumer Protection Act under Va. Code § 8.01-27.5 (against ECC) |
| **Count VII:** | Violations of the Fair Debt Collections Practices Act under 15 U.S.C. § 1692e (against Medlytix) |

(ECF No. 34, at 15–41.)

---

[5] Ms. Shelton's Amended Complaint does not contain a Count III.

Medlytix and ECC filed the instant Motions to Dismiss.  (ECF Nos. 41, 43.)  Both argue that dismissal of the Amended Complaint is proper under Fed. R. Civ. P. 12(b)(6). (ECF No. 41, at 1; ECF No. 43, at 1.)  Ms. Shelton filed a response to both Motions. (ECF Nos. 50, 51.)  Medlytix and ECC each filed a reply.  (ECF Nos. 53, 54.)

For the reasons articulated below, the Court will grant the Motions to Dismiss. (ECF Nos. 41, 43.)

## II.  Standard of Review:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  "[O]n a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief."

8

*Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Giacomelli*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty, Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (concluding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

### III. Analysis

Ms. Shelton brings six class action counts: one against only Medlytix, three against only ECC, and two against both Defendants jointly. (ECF No. 34, at 15–41.) Although Ms. Shelton alleges each of her six counts as putative class claims, in their respective motions to dismiss the Amended Complaint, both Defendants bypass discussion of the class-wide claims.[6] Rather, Defendants attack each count of the Amended

---

[6] The single exception is ECC's argument regarding the "RICO Class", which it contends fails to satisfy RICO's continuity requirement because Ms. Shelton "fails to supply any details regarding . . . the identity . . . of the other persons purportedly defrauded by Defendants." (ECF No. 44, at 29 (internal quotation marks and citation omitted).)

Complaint as though it were pled individually on behalf of Ms. Shelton. The Court recognizes that Ms. Shelton's inability to bring a sustainable individual claim means that she cannot serve as a named plaintiff for any of the proposed class claims at bar, but will include the class allegations as pled in the interest of creating a full record.

Ms. Shelton articulates claims against Medlytix of violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), unjust enrichment, and violation of the Fair Debt Collections Practices Act ("FDCPA"). (ECF No. 34, at 15–22, 26–29, 38–41.) Ms. Shelton charges ECC with a violation of RICO, breach of contract, unjust enrichment, breach of implied contract, and a violation of the Virginia Consumer Protection Act ("VCPA"). (ECF No. 34, at 15–38.) Both Defendants request that the Court dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 41, at 1; ECF No. 43, at 1.) For the reasons articulated below, the Court will grant the Motions to Dismiss. (ECF Nos. 41, 43.)

> **A.     The Amended Complaint Fails to State a Claim Against Either ECC or Medlytix for a RICO Violation Under 18 U.S.C. § 1962(a) or (c) (Count I )**

Count I of the Amended Complaint asserts a RICO claim on behalf of Ms. Shelton and "the RICO class", which the Amended Complaint defines as:

> All natural persons (a) who received services at an emergency room from an emergency provider employed by Defendant ECC in the four years before the filing of this action; (b) who were Medicaid managed care organization plan members at the time of such services; (c) who paid Defendant ECC money in excess of the lesser of the applicable Medicaid fee schedule amount or the actual charge (charge to general public) for the services rendered by the emergency provider employed by Defendant ECC; and (d) whose payment Defendant ECC shared with Medlytix.

(ECF No. 34 ¶ 55.)

10

The Amended Complaint states that ECC and Medlytix "use income from racketeering activity to operate an enterprise engaged in [] interstate commerce in violation of 18 U.S.C. § 1962(a)", (ECF No. 34 ¶ 62), based on predicate acts of mail and wire fraud.  But in her opposition to Medlytix's Motion to Dismiss, Ms. Shelton asserts that she "pleads her RICO claim under 18 U.S.C. § 1962(c), and therefore, declines to address Medlytix's argument against a nonexistent claim under 18 U.S.C. § 1962(a)." (ECF No 51, at 24 n.10.)  The Amended Complaint makes no mention of 18 U.S.C. § 1962(c).[7]

Evaluating the RICO claim under 18 U.S.C. § 1962(a), as pled, this Court concludes that the Amended Complaint fails to plausibly state a RICO violation involving the predicate acts of mail and wire fraud.  (ECF No. 34 ¶¶ 79–88.)  However, even were the Court to analyze the claim under 18 U.S.C. § 1962(c), the Court would find that the Amended Complaint fails to plausibly state a RICO violation.  As a result, the Court will dismiss Count I as to both defendants.

### 1.    Legal Standard:  RICO

RICO provides a private right of action for treble damages to persons injured in their business or property as a result of a violation of RICO's criminal prohibitions contained in 18 U.S.C. § 1962.  *See* 18 U.S.C. § 1964(c); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 641 (2008).  "The showing required to succeed on a RICO

---

[7] It is well established that "a plaintiff may not amend her complaint via briefing." *Hurst v. District of Columbia*, 681 F. App'x 186, 194 (4th Cir. 2017); *see also Brooks v. Chapman*, No. 1:22cv305 (LMB), 2022 WL 17852779, at *3 (E.D.Va. Dec. 22, 2022) (stating that a motion to dismiss "requires a court to consider the sufficiency of the complaint itself, and a plaintiff may not amend his Complaint . . . in a brief opposing a motion").

charge in the Fourth Circuit is both demanding and well-established," *Baker v. Sturdy Built Mfg., Inc.*, No. 2:07cv212 (HEH), 2007 WL 3124881, at *3 (E.D. Va. Oct. 23, 2007), because "Congress contemplated that only a party engaging in widespread fraud would be subject to [RICO's] serious consequences." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989).

To state a claim under 18 U.S.C. § 1962(a),[8] a plaintiff must allege that: "(1) the Defendants derived income from a pattern of racketeering activity [or through the collection of an unlawful debt]; [and] (2) the income was used or invested, directly or indirectly, in the establishment or operation; (3) of an enterprise; (4) which is engaged in or the activities of which affect interstate or foreign commerce." *Smithfield Foods, Inc. v.*

---

[8] Section 1962(a) provides:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

18 U.S.C. § 1962(a).

*United Food & Commercial Workers Int'l Union, et. al.*, 633 F. Supp. 2d 214, 222 (E.D. Va. 2008) (citing *United States v. Vogt*, 910 F.2d 1184, 1193 (4th Cir. 1990)).

To establish a violation of § 1962(c),[9] a plaintiff must allege that the Defendants (1) conducted the affairs of an enterprise (2) through a pattern of racketeering activity or collection of unlawful debt (3) while employed by or associated with (4) the "enterprise engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(c); *cf. Smithfield Foods*, 633 F. Supp. 2d at 222 (providing the elements for satisfying § 1962(c) claims founded on allegations of racketeering activity).

While 18 U.S.C. § 1962(c) prohibits "conducting or participating in a RICO enterprise," 18 U.S.C. § 1962(a) prohibits "investment of proceeds of racketeering activity." *Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 271 (4th Cir. 2010). For purposes of both sections, racketeering activity includes any act indictable under specific federal statutes, including 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). *See* 18 U.S.C. § 1961(1).

In turn, proof of mail and wire fraud requires satisfaction of the same core elements: that (1) Defendants "knowingly participated in a scheme to defraud, and (2) the mails or interstate wire facilities were used in furtherance of the scheme." *Choimbol v.*

---

[9] Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

*Fairfield Resorts, Inc.*, 428 F.Supp.2d 437, 443 (E.D. Va. 2006). "Where RICO claims are based on predicate acts of fraud, the heightened pleading standard set forth in Rule 9(b) of the Federal Rule[s] of Civil Procedure applies." *Field v. GMAC LLC*, 660 F.Supp.2d 679, 686 (E.D. Va. 2008) (citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) and *Choimbol*, 428 F.Supp.2d at 445–46). "[T]he 'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he [or she] obtained thereby.'" *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1297, at 590 (2d ed. 1990)).

### 2.    Summary of the RICO Claims Brought Against ECC and Medlytix

Ms. Shelton cites acts of mail fraud and wire fraud as the predicate acts constituting "racketeering activity". (ECF No. 34 ¶¶ 79–88; *see also* 18 U.S.C. § 1961(1).) To plead the predicate acts of mail and wire fraud, Ms. Shelton must show that: (1) Defendants "knowingly participated in a scheme to defraud, and (2) the mail or interstate wire facilities were used in furtherance of the scheme." *Choimbol v. Fairfield Resorts, Inc.*, 428 F.Supp.2d 437, 443 (E.D. Va. 2006).

According to the Amended Complaint, "Defendants conducted or participated, directly or indirectly, in acts of mail fraud and wire fraud by misrepresenting through the U.S. mail and interstate wire facilities the fraudulent nature of charges and bills generated for medical services and entitlement to collect on such fraudulent charges and bills." (ECF No. 34 ¶ 88.) The three acts of mail and wire fraud Ms. Shelton experienced,

14

identified below, allow her to "fairly and adequately protect the interests of the class",

Fed. R. Civ. P. 23(a)(4), she purports to represent on behalf of similarly situated others:

> (1) ECC's issuance of "a bill to Ms. Shelton dated January 26, 2022 which falsely claimed an outstanding charge of $1,177.00 for the services purportedly provided by Dr. Chang";

> (2) Medlytix's issuance "by mail or wire, [of] a fraudulent bill to State Farm on or about January 27, 2022"; and,

> (3) Medlytix's "false[] represent[ation]" in August 2022 "to Ms. Shelton's legal counsel that Ms. Shelton remained responsible for an outstanding, inflated charge of $1,177.00."

(ECF No. 34 ¶ 83.)

For the reasons articulated below, Ms. Shelton fails to state a RICO claim under

any of the theories she places before the Court.

### 3.    Ms. Shelton's RICO Claims against ECC And Medlytix Founder Because She Fails to Plausibly Allege that Defendants Engaged in a Pattern of Racketeering Activity or Collection of Unlawful Debt

Ms. Shelton fails to meet her Rule 12(b)(6) burden to allege plausible facts

supporting her contention that Medlytix and ECC derived income through a pattern of

racketeering activity or collection of unlawful debt as required to state a RICO claim

under both 18 U.S.C. § 1962(a) and (c). *See* 18 U.S.C. § 1962(a), (c).

Three fundamental assertions undergird Ms. Shelton's claims. First, she posits that

a medical provider that is in-network with Virginia Premier *must* bill Virginia Premier

whenever a Medicaid patient is treated, even when a third-party source might be available

to cover the charges. (ECF No. 34 ¶ 48.) Second, she contends that when a provider is

out-of-network with Virginia Premier and treats a Medicaid patient, that provider's

recovery from non-Medicaid sources (such as auto insurance) may not exceed Medicaid

reimbursement rates. [10] (ECF No. 34 ¶ 48.) In the alternative and as a third argument, Ms.

Shelton alleges that "[e]ven assuming federal and state statutes" did not preclude

Defendants' collection of Ms. Shelton's debt, case law renders it unlawful because

"providers who have not reached an agreement on price with patients, like any other

service provider, may only recover the reasonable market value of their services." (ECF

No. 34 ¶ 10.)

Defendants counter that, because Medicaid is a payer of *last* resort—not the source

to whom providers must first turn—Plaintiff fails to state a claim upon which relief can be

granted. *Rehab. Ass'n of Va., Inc. v. Kozlowski*, 42 F.3d 1444, 1447–48 (4th Cir. 1994).

This Court agrees.

> **a.    If Dr. Chang Were an In-Network Provider, Ms. Shelton Does Not State a Claim that Defendants Violated RICO by Collecting an Unlawful Debt Because They Were Required to Bill Medicaid**

First, Ms. Shelton does not plausibly allege that, if Dr. Chang is a Virginia Premier

"in-network" provider, the Defendants' billing practices violate applicable law by failing

to bill Medicaid or Virginia Premier first, rather than seeking reimbursement elsewhere.

Contrary to Ms. Shelton's suggestion, courts have consistently held that "federal law does

not require that a medical services provider bill Medicaid every time it treats a Medicaid

beneficiary." *See Robinett v. Shelby Cnty. Healthcare Corp.*, 895 F.3d 582, 586 (8th Cir.

2018) (citing Medicaid Program; State Plan Requirements and Other Provisions Relating

---

[10] The Amended Complaint does not allege whether Dr. Chang is an in-network or out-of-network providers with Virginia Premier. (ECF No. 34 ¶ 48.) It does allege that "[u]pon information and belief, Defendant ECC is an 'in-network provider' with Virginia Premier." (ECF No. 34 ¶ 141.) Ms. Shelton argues that Dr. Chang's or ECC's status with Virginia Premier is of no moment in assessing whether she states a viable RICO claim.

to State Third Party Liability Programs, 55 Fed. Reg. 1423, 1428 (1990) ("The provider is not restricted from receiving amounts from third party resources available to the recipient (or his or her legal representative)").

Plaintiff posits that if Dr. Chang were an in-network provider for Ms. Shelton's Medicaid plan administered by Virginia Premier, Defendants were *required* to bill through Virginia Premier for the cost of her emergency medical treatment. (ECF No. 50, at 3 ([In-network "[p]roviders . . . must accept payment from [Virginia Premier] as payment in full and may not seek to collect payment from the beneficiary at a higher rate").) Plaintiff contends that if Dr. Chang is an in-network provider, "liability and UIM insurers have no obligation to pay any bill issued by [] ECC (or any other emergency provider)" because Va. Code Ann. § 8.01-27.5(B)[11] requires ECC to submit its claim to Virginia Premier or forfeit its ability to collect any claimed charges from Ms. Shelton. (ECF No. 34, at 10 n. 4.) Also, Plaintiff contends that Defendants violated 42 U.S.C. §§ 1396a(a)(25)(C),[12]

---

[11] Virginia Code § 8.01-27.5(B) protects patients covered under a health insurance plan from having to pay a bill for which an in-network provider was required to submit an insurance claim and failed to do so:

> An in-network provider that provides health care services to a covered patient shall submit its claim to the health insurer for the health care services in accordance with the terms of the applicable provider agreement or as permitted under applicable federal law or state laws or regulations . . . . If an in-network provider does not submit its claim to the health insurer in accordance with the requirements of this subsection, then (i) the covered patient shall have no obligation to pay for health care services for which the in-network provider was required to submit its claim[.]

Va. Code § 8.01-27.5(B).

[12] 42 U.S.C. § 1396a(a)(25)(C), part of the federal Medicaid statute, states in relevant part that a state Medicaid plan must prohibit a provider from seeking payment above certain state Medicaid plan limits:

which proscribes ECC and Dr. Chang from accepting payment more than that amount equal to the negotiated reimbursement rate under the state medical assistance plan. (ECF No. 51, at 4, 8.)

Ms. Shelton's adds that Defendants' billing and collecting money from "Medicaid recipients and their lawyers as well as liability insurers and insurers providing uninsured motorist (UIM) coverage" is "fraudulent." (ECF No. 34 ¶ 8.)

This Court must conclude that Ms. Shelton fails to state a claim that ECC and Dr. Chang violate the federal and state laws she invokes, much less that they do so to a fraudulent degree. "[F]ederal law does not require that a medical services provider bill Medicaid every time it treats a Medicaid beneficiary." *Robinett*, 895 F.3d at 586. Ms. Shelton argues that 42 U.S.C. § 1396(a)(25)(C) "prohibit[s] a provider [who treats a Medicaid beneficiary] from submitting a charge directly to the beneficiary." (ECF No. 51, at 8 (emphasis omitted).)

As noted above, the statute does preclude a provider who treats a Medicaid patient from submitting a bill to the patient that exceeds certain amounts. However, 42 U.S.C.

---

[T]hat in the case of an individual who is entitled to medical assistance under the State plan with respect to a service for which a third party is liable for payment, the person furnishing the service may not seek to collect from the individual . . . payment of an amount for that service (i) if the total amount of the liabilities of third parties for that service is at least equal to the amount payable for that service under the plan . . . or (ii) in an amount which exceeds the lesser of (I) the amount which may be collected under section 1396o of this title, or (II) the amount by which the amount payable for that service under the plan . . . exceeds the total of the amount of the liabilities of third parties for that service[.]

42 U.S.C. § 1396a(a)(25)(C).

As explained below, however, these limits apply in circumstances not before this Court, *i.e.*, when a provider has already accepted payment from Medicaid.

18

§ 1396a(a)(25)(C) governs what "[a] State plan for medical assistance must . . . provide", 42 U.S.C. § 1396(a), and "is not triggered until a provider bills and accepts payment *from Medicaid* for services provided to a Medicaid-eligible patient." *Miller v. Gorski Wladyslaw Estate*, 547 F.3d 273, 283 (5th Cir. 2008) (emphasis added); *see also Robinett*, 895 F.3d at 587 ("§ 1396a(a)(25)(C) only becomes relevant *once the provider has billed Medicaid and accepted payment* for services provided to a beneficiary") (emphasis in original).  In circumstances where a provider bills and accepts payment from Medicaid, 42 U.S.C. § 1396a(a)(25)(C) prohibits providers from seeking to recover from the Medicaid patient an amount equal to or greater than the amount Medicaid will pay.  Indeed, Courts have interpreted this provision "as a prohibition on 'balance billing' and 'substitute billing.'"[13]  *Miller*, 547 F.3d at 283.  In other words, when a provider elects to bill

---

[13] "Federal Medicaid law precludes direct patient billing in two specific instances . . . substitute billing and balance billing." *Robinett*, 895 F.3d at 587.  "A medical provider engages in substitute billing when it has *already* accepted payment from Medicaid but tries to refund the payment in order to bill the patient directly, usually because Medicaid reimbursements are often much lower than the provider's customary fees." *Id.* (internal quotation marks omitted) (emphasis in original).  "Balance billing occurs when a *provider accepts payment from Medicaid and then seeks to recover from the patient* the balance between that payment and its customary fee." *Id.* (internal quotation marks omitted) (emphasis in original).

On the other hand, permissible methods exist where *Medicaid* itself seeks recovery of a bill from a liable third party.  One is "cost avoiding", which requires Medicaid, in situations where the "'agency has established the probable existence of third party liability at the time the claim is filed,'" to "'reject the claim and return it to the provider.'" *Id.* (quoting 42 C.F.R. § 433.139(b)(1)).  Another, "pay and chase", allows Medicaid to pay "the total amount allowed under the agency's payment schedule and then seek[] reimbursement from the liable third party." *Id.* (internal quotation marks omitted).  Neither method is at issue here, because Medicaid was not billed for—and did not pay for—Ms. Shelton's medical care provided by ECC.

Medicaid for the cost of a patient's treatment (which did not happen here), it is required to accept the Medicaid rate—and not seek to recover additional money elsewhere.

But federal law did not *prohibit* Defendants from electing to *forgo* the certainty of payment through Medicaid and instead seek to recover from Ms. Shelton or State Farm (and therefore risk possible non-payment). "The provision [§ 1396a(a)(25)(C)] does not bar a provider from taking a chance that a Medicaid-eligible patient has a non-Medicaid source of payment for the medical services rendered." *Robinett*, 895 F.3d at 587. "The provider thus may opt to attempt collection directly from the patient or a liable third party instead of seeking a certain but likely reduced payment from Medicaid." *Id.; see also Miller*, 547 F.3d at 285 (stating that a provider "remains free to seek its entire customary fee from the patient").

Nor does Virginia law provide Ms. Shelton refuge. Ms. Shelton's claim that Virginia law prohibited Defendants from billing and seeking to collect the $1,177.00 debt from her or a liable third party is flawed for reasons similar to those that defeat her reliance on federal law. Ms. Shelton asserts that "[i]f Dr. Chang was an in-network provider for [Ms. Shelton's] Virginia Premier plan, Virginia Code § 8.01-27.5([B]) required Dr. Chang and Defendant ECC to submit their claim to Virginia Premier or forfeit their ability to collect any claimed charges from [Ms. Shelton]." (ECF No. 34 ¶ 48.)

Plaintiff's argument does not persuade because this Virginia statute does not govern here given the facts before the Court. Defendants were not required to submit a claim, in the first instance, to Medicaid for the medical services provided to Ms. Shelton. The federal statute invoked by Plaintiff does not require a provider to turn to Medicaid

first, and this state statute specifically disclaims any inconsistency with Medicaid's rules regarding submission of claims. Virginia Code § 8.01-27.5(B) ("To the extent that . . . Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (Medicaid) . . . provide[s] otherwise, health care providers shall be permitted to submit claims and coordinate benefits as provided for in the provider agreements or plan documents or as required applicable federal and state laws and regulations.") Further, Ms. Shelton points to no "applicable federal or state laws or regulations", Va. Code § 8.01-27.5, that support her claim that ECC was "required to submit its claim" to Medicaid, a payer of last resort. Va. Code § 8.01-27.5(B); *see also Kozlowski*, 42 F.3d at 1447 ("Medicaid is essentially a payer of last resort"). Thus, Virginia Code § 8.01-27.5(B)—which provides that a "covered patient shall have no obligation to pay for health care services for which the in-network provider was required to submit its claim" but "d[id] not submit its claim"—simply does not pertain here.

Thus, even viewing the facts alleged in the light most favorable to Ms. Shelton, she fails to state a plausible claim that Defendants were engaged in racketeering or the unlawful collection of debt in violation of RICO because federal and Virginia law required them to bill Medicaid. *See Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[O]n a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'")

**b.  If Dr. Chang Were an Out-of-Network Provider, Ms. Shelton Does Not State a Claim that Defendants Violated RICO When They Collected "More Than the Medicaid Rate" from Ms. Shelton**

Second, Plaintiff suggests that, if Dr. Chang fell into the out-of-network provider category, Defendants' actions would be similarly prohibited, but by different federal and state laws. As to an out-of-network provider, the recovery of more than the Medicaid rate would run afoul of 42 U.S.C. 1396u-2(b)(2)(D); 12 Va. Admin. Code § 30-120-395 ("MCOs shall pay for . . . emergency . . . services to members in compliance with the contract and 42 CFR [§] 438.114 . . . [E]mergency . . . services provided to" an out-of-network provider "will be reimbursed according to the current Medicaid fee schedule" and "this reimbursement shall be considered payment in full) and Va. Admin. Code § 30-80-30 (requiring emergency providers to accept the lesser of the state agency fee schedule or "actual charge (charge to the general public)"). Ms. Shelton's contention that Defendants engaged in racketeering or the collection of unlawful debt because they recovered "more than the rate for such services provided for in the state agency fee schedule" fails. (ECF No. 34 ¶ 48.)

In support of her assertion that Defendants "refus[al] to . . . reduce [their] bill[s] to the amount paid by the appropriate state Medicaid program" was a violation of federal law, (ECF No. 34 ¶ 27), Ms. Shelton cites 42 U.S.C. § 1396u-2(b)(2)(D). That statute governs the amount a provider may recover from a state Medicaid managed care entity when the provider is out-of-network and thus does not have a contract in effect with the entity that establishes the amount the provider may recover:

> Any provider of emergency services that does not have in effect a contract
> with a Medicaid managed care entity that establishes payment amounts for
> services furnished to a beneficiary enrolled in the entity's Medicaid managed

> care plan must accept as payment in full no more than the amounts . . . that
> it could collect if the beneficiary received medical assistance under this
> subchapter other than through enrollment in such an entity.

42 U.S.C. § 1396u-2(b)(2)(D). Ms. Shelton argues that this statute "prohibited ECC from

collecting more than the Medicaid rate from Ms. Shelton", (ECF No. 51, at 8), in the event

that "Dr. Chang was not an in-network provider for [Ms. Shelton's] plan from Virginia

Premier". (ECF No. 34 ¶ 48.)

      Ms. Shelton misapprehends this Medicaid statute, which governs the amount of

money a provider may collect *from Medicaid*. This statute has no bearing on the amount a

provider may bill a third party. *See Robinett*, 895 F.3d at 587 ("The Provider thus may opt

to attempt collection directly from the patient or a liable third party instead of seeking a

certain *but likely reduced payment from Medicaid*") (emphasis added). Indeed, "[f]ederal

law does not require health care providers to participate in a state's Medicaid program."

*Miller*, 547 F.3d at 281 (citing 42 U.S.C. § 1396(a)(a)(23)). Rather, a provider

"voluntarily contracts with [a] state to provide services to Medicaid-eligible patients in

return for reimbursement from the state at . . . specified rates." *Spectrum Health*

*Continuing Care Group v. Bowling*, 410 F.3d 304, 313 (6th Cir. 2005). It is a widely-

accepted proposition that "the remuneration provided under Medicaid is often

significantly less than that provided by private insurers[.]" *Barney v. Holzer Clinic, Ltd.*,

110 F.3d 1207, 1211–12 (6th Cir. 1997). Ms. Shelton's assertion that Medicaid itself,

under 42 U.S.C. § 1396u-2(b)(2)(D), requires providers to bill *third parties* at the reduced

Medicaid rates must fail.

      Again, Virginia law does not direct a different outcome. In the event that "Dr.

Chang was not an in-network provider for [Ms. Shelton's] plan from Virginia Premier",

Ms. Shelton also asserts that two sections of the Virginia Administrative Code prohibited

Defendants from "recovering more than the rate for such services provided for in the

agency fee schedule." (ECF No. 34 ¶ 48.) Ms. Shelton cites § 30-120-395 of title 12 of

the Virginia Administrative Code, which governs the rate at which state Medicaid

Managed Care Organizations reimburse providers who render services to out-of-network

patients:

> The MCOs shall pay for preauthorized, emergency, and post-stabilization
> services to members in compliance with the contract and 42 CFR 438.114.
> Preauthorized, emergency, and post-stabilization services provided to a
> managed care member by a provider or facility not participating in the
> MCO's network will be reimbursed according to the current Medicaid fee
> schedule. This reimbursement shall be considered payment in full to the
> provider or facility of emergency services.

12 Va. Admin. Code § 30-120-395. She also points to § 30-80-30 of title 12 of the

Virginia Administrative Code, which states, in relevant part: "Payment for physician

services shall be the lower of the state agency fee schedule or actual charge (charge to the

general public)[.]" 12 Va. Admin. Code § 30-80-30.[14]

Thus, these sections do not pertain to situations in which, as here, a provider bills a

*third-party liability insurer*—rather than a state Medicaid program—for medical costs

---

[14] Both provisions fall under Section 30 of Title 12 of the Virginia Administrative
Code, pertaining to the Virginia "Department of Medical Assistance Services" ("DMAS"),
which is an agency that "administers Medicaid programs for low income individuals in
Virginia." *United States v. Perry*, 659 F. App'x 146, 148 (4th Cir. 2016). The first
provision Ms. Shelton cites to, 12 Va. Admin. Code § 30-120-395, is under Chapter 120,
titled "Waivered Services." 12 Va. Admin. Code § 30-120-395. Section 395 sets forth the
rate at which out-of-network providers are reimbursed by DMAS. The second provision
Ms. Shelton cites to, 12 Va. Admin. Code § 30-80-30, is under Chapter 80, titled
"Methods and Standards for Establishing Payment Rate; Other Types of Care." 12 Va.
Admin. Code § 30-80-30. Section 30 sets forth specific services for which *DMAS* will pay
the lower of 1) the state agency fee schedule or 2) the actual charge of the service.

incurred by a Medicaid beneficiary. Ms. Shelton's claim that Virginia law requires providers to bill third parties at the reduced Medicaid rates must falter as alleged.

As a result, Ms. Shelton's allegation that Defendants violated RICO through mail and wire fraud because they were engaged in racketeering or the unlawful collection of debt by "collecting more than the Medicaid rate from Ms. Shelton", (ECF No. 51, at 8), fails.

> **c.    Ms. Shelton's Allegation that Defendants Violated RICO Because They Recovered More Than the Reasonable Market Value of Their Services Cannot Prevail**

The Amended Complaint alleges that even if Defendants' billing scheme does not violate federal or state statutes, these inflated charges run counter to findings by "courts throughout the country" recognizing that "providers who have not reached an agreement on price with patients, like any other service provider, may only recover the reasonable market value of their services."[15] (ECF No. 34 ¶ 10.) Notably, Ms. Shelton fails to cite any authority in support of that proposition, much less case law from this district or the Fourth Circuit. And the contrast of Ms. Shelton's bill for $1,177.00 with lesser amounts received in instances where Medicaid paid for medical services cannot plausibly state a claim that her bill was unreasonably high when the law does not require Medicaid billing. *Cf. Barney*, 110 F.3d at 1211–12 ("the remuneration provided under Medicaid is often significantly less than that provided by private insurers"); *see also Robinett*, 895 F.3d at 587 ("The Provider thus may opt to attempt collection directly from the patient or a liable

---

[15] The Amended Complaint is ambiguous as to whether Plaintiff makes this argument in conjunction with her RICO claim. The Court addresses it here to the extent she asserts this argument as a third basis for her RICO claim.

third party instead of seeking a certain *but likely reduced payment from Medicaid*")
(emphasis added).

      Even assuming their truth, Ms. Shelton's allegations that the prices charged by
Defendants for emergency medical services are "excessive", "inflated", and "bear no
relation to the reasonable value of the services provided", (ECF No. 34 ¶¶ 8, 10),
insufficiently state a RICO claim. *See Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538
(4th Cir. 1988) (stating that "this circuit will not lightly permit ordinary business contract
or fraud disputes to be transformed into federal RICO claims); *see also Menasco, Inc.*, 886
F.2d at 683 ("Congress contemplated that only a party engaging in widespread fraud
would be subject to [RICO's] serious consequences"). An excessive or inflated medical
bill permitted by statutory provisions does not constitute a pattern of racketeering activity
or collection of unlawful debt amounting to a RICO claim even when it occurs repeatedly
as part of an unsavory business model. *See* 18 U.S.C. § 1962(a), (c). Further, given the
failure to establish a RICO violation, even reading the allegations favorably, Ms. Shelton's
contention that the $1,177.00 amount she was billed by Defendants for emergency
medical care exceeded the reasonable market value for those services does not suffice to
meet the higher pleading standard required to state a RICO claim based on the predicate
acts of mail and wire fraud. *See Field*, 660 F.Supp.2d at 686 ("Where RICO claims are

based on predicate acts of fraud, the heightened pleading standard set forth in Rule 9(b) of

the Federal Rule[s] of Civil Procedure applies").

As a result, Ms. Shelton's argument that Defendants[16] violated RICO because they

unlawfully billed and collected an amount above the reasonable market value of the

services rendered fails.  (ECF No. 34 ¶ 10.)

Ms. Shelton's Amended Complaint does not state a claim on her own behalf, so

she does not qualify as an adequate class representative under Federal Rule of Civil

Procedure 23 for the class for which she asserts Count I.  *See* Fed. R. Civ. P. 23(a)(3)

("representative parties [may sue] on behalf of all members only if . . . the representative

parties will fairly and adequately protect the interests of the class.")  Because the

Amended Complaint fails to state an individual RICO claim as to Ms. Shelton—the sole

class representative—the RICO claim may not be brought as a class claim.  Therefore, the

Court will dismiss the Amended Complaint's RICO claim against both ECC and Medlytix

in Count I.

**B.    The Amended Complaint Fails to State a Claim for Breach of Contract
Against ECC (Count II)**

Count II of the Amended Complaint asserts a breach of contract claim on behalf of

Ms. Shelton and "the Breach of Contract Class", which the Amended Complaint defines

as:

> All natural persons (a) who received services at an emergency room from an
> emergency provider employed by Defendant ECC in the five years before

---

[16] The Amended Complaint bases it RICO claim as to Medlytix on the factual
assertion that "Medlytix involved itself" in and designed the business model of the
"Fraudulent Billing Enterprise" so that the full $1,177.00 could be collected "on behalf of
Defendant ECC."  (ECF No. 34 ¶¶ 5, 16, 31.)  Because the Amended Complaint fails to
state a claim that ECC's $1,177.00 bill was fraudulent, Medlytix's involvement in
collection likewise fails to state a RICO violation.

the filing of this action; (b) were Medicaid managed care organization plan members at the time of such services; (c) paid Defendant ECC money in excess of the negotiated rate(s) for such service(s) provided for by the applicable managed care organization provider agreement.

(ECF No. 34 ¶ 98.)

## 1.    Legal Standard:  Breach of Contract

"To state a claim for breach of contract under Virginia law, a plaintiff must plausibly allege in federal court: (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of that obligation; and (3) an injury or harm caused by the defendant's breach." *Hardnett v. M&T Bank*, 204 F.Supp.3d 851, 860 (E.D. Va. 2016) (citing *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).  To bring a breach of contract claim "on the third-party beneficiary contract theory, the party claiming the benefit must show that the parties to a contract clearly and definitely intended to confer a benefit upon him." *Copenhaver v. Rogers*, 384 S.E.2d 593, 596 (Va. 1989) (internal quotation marks and citation omitted).  "'A clear intent to benefit the third person must appear to enable him to sue on the contract; incidental beneficiaries cannot maintain an action thereon.'" *Valley Landscape Co., Inc. v. Rolland*, 237 S.Ed.2d 120, 122 (Va. 1977) (quoting *N.P. Newspapers v. Stott*, 156 S.E.2d 610, 612 (Va. 1967)).

## 2.    Ms. Shelton's Breach of Contract Claim Against ECC Founders Because She Fails to Plausibly Allege the Breach of a Legally Enforceable Obligation

The Amended Complaint states that "if Dr. Chang was an in-network provider for Plaintiff's Medicaid plan from Virginia Premier, he contractually agreed to limit the amount recoverable from Plaintiff for the services purportedly rendered to her to the negotiated rate for such services offered by Virginia Premier." (ECF No. 34 ¶ 48.)  Ms. Shelton "was an intended third-party beneficiary of any provider contract with Virginia

28

Premier." (ECF No. 34 ¶ 48.)  The Amended Complaint explains that "Defendant ECC, through Dr. Chang or on its own, entered into a provider agreement with Virginia Premier", which "specifically contemplated the provision of services, in accordance with that agreement, to Virginia Premier plan members like [Ms. Shelton]." (ECF No. 34 ¶¶ 92, 94.)  "[T]he operative provider agreements with Virginia Premier limited its reimbursement rates for the services purportedly provided by Dr. Chang to a fraction of the $1,177.00 claimed by [] ECC as Plaintiff's defaulted obligation." (ECF No. 34 ¶ 96.) Consequently, Ms. Shelton provides the conclusory legal contention that ECC breached the provider agreement "by demanding and collecting charges for services exceeding the negotiated amounts for such services set forth in its provider agreements." (ECF No. 34 ¶ 104.)

However, Ms. Shelton "ha[s] neither produced this [] agreement, nor pleaded any of its essential terms." *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 119 (4th Cir. 2020) (holding that plaintiffs could not advance their breach of contract claim as to a contract of which they failed to plead essential terms and failed to produce).  Ms. Shelton fails to identify "the specific contractual provisions that [] [ECC] breached", including the rate to which Virginia Premier allegedly limited ECC's recovery of the cost of the medical services it provided. *See Walsh v. Bank of America*, NA, No. 1:11-cv-1168 (AJT), 2012 WL 13020695, at *2 (E.D. Va. Feb. 15, 2012) (dismissing breach of contract claim when plaintiff failed to allege "the specific contractual provisions that [] defendants breached,

the specific conduct of each defendant that allegedly violated each identified contractual

provision, and the dates on which the alleged conduct occurred").

Ms. Shelton's conclusory allegation that "Defendant ECC, through Dr. Chang or

on its own, entered into a provider agreement with Virginia Premier" and that the provider

agreement "limited its reimbursement rates for the services purportedly provided by Dr.

Chang to a fraction of the $1,177.00 claimed by [] ECC" insufficiently shows "a legally

enforceable obligation." *Filak*, 594 S.E.2d at 614; *see also Xia Bi v. McAuliffe*, No. 1:17-

cv-01459 (CMH), 2018 WL 10483857, at *2 (E.D. Va. Mar. 30, 2018) (dismissing breach

of contract claim when plaintiff did "not cite to any specific provisions in the Agreement

that Defendants are alleged to have breached"). Because Ms. Shelton has failed to

plausibly allege the existence of a legally enforceable obligation in the form of a contract

between Virginia Premier and ECC, the Court need not reach the question of whether she

is a third-party beneficiary of the alleged agreement.[17] *See Edwards*, 983 F.3d at 120

("without an agreement to enforce, the question of third-party-beneficiary status is

irrelevant.") (citation omitted).

Ms. Shelton's Amended Complaint does not state a claim on her own behalf, so

she does not qualify as an adequate class representative under Federal Rule of Civil

Procedure 23 for the class for which she asserts Count II. *See* Fed. R. Civ. P. 23(a)(3)

("representative parties [may sue] on behalf of all members only if . . . the representative

parties will fairly and adequately protect the interests of the class.") Because the

Amended Complaint fails to state an individual breach of contract claim as to Ms.

---

[17] Were the Court to reach that issue, it would struggle to identify facts suggesting that the parties to the supposed contract intended to confer any third-party benefit on Ms. Shelton individually.

30

Shelton—the sole class representative—the breach of contract claim may not be brought

as a class claim.  Therefore, the Court will dismiss the Amended Complaint's breach of

contract claim against ECC in Count II.

### C.    The Amended Complaint Fails to State a Claim for Unjust Enrichment Against Both ECC and Medlytix (Count IV)

Count IV of the Amended Complaint asserts an unjust enrichment claim on behalf

of Ms. Shelton and "the Unjust Enrichment Class", which the Amended Complaint

defines as:

> All natural persons (a) who received services at an emergency room from an
> emergency provider employed by Defendant ECC in the three years before
> the filing of this action; (b) who were Medicaid managed care organization
> plan members at the time of such services; (c) who paid Defendant ECC
> money in excess of the lesser of the applicable Medicaid fee schedule amount
> or the actual charge (charge to general public) for the services rendered by
> the emergency provider employed by Defendant ECC; and (d) whose
> payment Defendant ECC shared with Medlytix.

(ECF No. 34 ¶ 107.)

### 1.    Legal Standard:  Unjust Enrichment

"Under Virginia law, '[t]he cause of action for unjust enrichment . . . applies as

follows:  (1) plaintiff conferred a benefit on defendant; (2) defendant knew of the benefit

and should reasonably have expected to repay plaintiff; and (3) defendant accepted or

retained the benefit without paying for its value.'" *Trustees of Columbia Univ. in City of*

*N.Y. v. NortonLifeLock, Inc.*, 580 F.Supp.3d 236, 265 (E.D. Va. 2022) (quoting *T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337 (2020)).

> **2.    Ms. Shelton's Unjust Enrichment Claim Founders Because She Fails to Allege That Defendants Inequitably Retained Any Benefit**

The Amended Complaint provides that "[a]s a result of its improper demand and collection of impermissible payments in excess of the amount allowed by contract and/or under federal and state law, Defendants obtained monies which rightfully belong to Plaintiff[.]" (ECF No. 34 ¶ 113.) Ms. Shelton further alleges that "Defendants' retention of these wrongfully obtained payments would violate the fundamental principles of justice, equity, and good conscience." (ECF No. 34 ¶ 116.)

As explained *supra* in Part III(A), Ms. Shelton fails to plausibly allege that Defendants' billing and collecting of the $1,177.00 charge incurred as a result of her medical treatment—which she voluntarily paid—violated any federal or state law. *See supra*, Part III(A). Ms. Shelton also fails to plausibly allege breach of contract. *See supra*, Part III(B). Ms. Shelton's description of inequity hinges entirely on her conclusory legal contention that Defendants retained a benefit "in excess of the amount allowed by contract and/or under federal and state law." (ECF No. 34 ¶ 113.)

Ms. Shelton does not plausibly allege facts raising even a reasonable inference that Defendants accepted or retained the benefit of the $1,177.00 bill under circumstances rendering it inequitable for them to do so without paying for its value, meaning her unjust enrichment claim cannot stand.

Ms. Shelton's Amended Complaint does not state a claim on her own behalf, so she does not qualify as an adequate class representative under Federal Rule of Civil

Procedure 23 for the class for which she asserts Count IV. *See* Fed. R. Civ. P. 23(a)(3)

("representative parties [may sue] on behalf of all members only if . . . the representative

parties will fairly and adequately protect the interests of the class.")  Because the

Amended Complaint fails to state an individual unjust enrichment claim as to Ms.

Shelton—the sole class representative—the unjust enrichment claim may not be brought

as a class claim.  Therefore, the Court will dismiss the Amended Complaint's unjust

enrichment claim against ECC and Medlytix in Count IV.

> **D.    Ms. Shelton Fails to State a Claim for Breach of Implied Contract Against ECC (Count V)**

Count V of the Amended Complaint asserts a breach of implied contract claim on

behalf of Ms. Shelton and "the Implied Contract Class", which the Amended Complaint

defines as:

> All natural persons (a) who received services at an emergency room from an
> emergency provider employed by Defendant ECC in the three years before
> the filing of this action; (b) were Medicaid managed care organization plan
> members at the time of such services; and (c) paid Defendant ECC money in
> excess of the reasonable compensation for the services provided by the
> emergency provider employed by Defendant ECC.

(ECF No. 34 ¶ 119.)

> **1.    Legal Standard:  Breach of Implied Contract**

"Virginia courts have long recognized an action for 'contract implied in law' or

quantum meruit by 'requiring one who accepts and receives the services of another to

make reasonable compensation for those services.'" *T.G. Slater & Son, Inc. v. Donald P.*

*and Patricia A. Brennan LLC*, 385 F.3d 836 (4th Cir. 2004) (quoting *Po River Water &*

*Sewer Co., v. Indian Acres Club of Thornburg, Inc.*, 495 S.E.2d 478, 482 (1998)); *see also*

*T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337, 341 (Va. 2020) ("A plaintiff can

33

seek recovery in *quantum meruit* when the work was done at the instance and request of another") (emphasis in original). "To state a claim for implied contract, the plaintiff must allege 'that (i) he [or she] rendered valuable services, (ii) to the defendant, (iii) which were requested and accepted by the defendant, (iv) under such circumstances as reasonably notified the defendant that the claimant, in performing the work, expected to be paid by the defendant.'" *T.G. Slater & Son*, 385 F.3d at 843 (quoting *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 491 (4th Cir. 1992)).

For example, a plaintiff can seek recovery under a breach of implied contract theory: "when (1) the parties contract for work to be done, but the parties did not agree on a price, (2) the compensation mentioned is too indefinite, (3) there is a misunderstanding as to the price to be paid, or (4) in some instances, the contract is void and of no effect." *T. Musgrove*, 840 S.E.2d at 341. "The remedy available to the *plaintiff* is an award of damages amounting to the reasonable value of the work performed [by the plaintiff], less the compensation actually received for that work. *Mongold*, 677 S.E.2d at 292 (citing *Hendrickson v. Meredith*, 170 S.E. 602, 605 (1933) (emphasis added)).

> ### 2.    Ms. Shelton's Breach of Implied Contract Claim Founders Because She Does Not Allege That She Provided Any Services to ECC

Ms. Shelton alleges that "ECC breached its implied contracts with [Ms. Shelton] . . . by demanding and collecting charges for services exceeding 'the reasonable value of the services provided.'" (ECF No. 34 ¶ 126 (quoting *T. Musgrove*, 840 S.E.2d at 341 (2020)). However, Ms. Shelton fails to allege that *she* performed any service—a fundamental element of a breach of implied contract claim. *See Mongold*, 677 S.E.2d at 292. Instead, she alleges that *ECC* performed a service for her. (ECF No. 34 ¶ 36 ("ECC

34

purportedly rendered medical services to [Ms. Shelton] at the emergency room for injuries sustained in the December 18, 2021, motor vehicle collision.")  Thus, as the entity who performed the service, ECC—not Ms. Shelton—is the proper party to bring a claim for unjust enrichment under the facts as alleged.  *See T.G. Slater & Son*, 385 F.3d at 843 (stating that to bring a claim for breach of implied contract, "the plaintiff must allege [] that he rendered valuable services [] to the defendant") (internal quotation marks omitted).  Ms. Shelton does not allege that she performed any service "at the instance and request of" ECC, her claim for breach of an implied contract fails.  *See Mongold*, 677 S.E.2d at 292.

Ms. Shelton's Amended Complaint does not state a claim on her own behalf, so she does not qualify as an adequate class representative under Federal Rule of Civil Procedure 23 for the class for which she asserts Count V.  *See* Fed. R. Civ. P. 23(a)(3) ("representative parties [may sue] on behalf of all members only if . . . the representative parties will fairly and adequately protect the interests of the class.")  Because the Amended Complaint fails to state an individual breach of implied contract claim as to Ms. Shelton—the sole class representative—the breach of implied contract claim may not be brought as a class claim.  Therefore, the Court will dismiss the Amended Complaint's claim for breach of implied contract in Count V.

### E.    The Amended Complaint Fails to State a Claim Against ECC for Violations of the Virginia Consumer Protection Act (Count VI)

Count VI of the Amended Complaint asserts a Virginia Consumer Protection Act ("VCPA") claim on behalf of Ms. Shelton and "the VCPA Class", which the Amended Complaint defines as:

All natural persons who (a) received services at an emergency room from an emergency provider employed by Defendant ECC; (b) were Medicaid managed care organization plan members in Virginia at the time of such services; and (c) paid Defendant ECC any amount of money in the two years before the filing of this action for services provided by the emergency provider employed by Defendant ECC.

(ECF No. 34 ¶ 130.)

### 1.     Legal Standard:  VCPA

Section 59.1-200(A)(67) provides:

A. The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

\*       \*       \*

67. Knowingly violating any provision of § 8.01-27.5[.]

Va. Code § 59.1-200(A)(67).  Virginia Code § 8.01-27.5(B) states, in relevant part,

An in-network provider that provides health care services to a covered patient shall submit its claim to the health insurer for the health care services in accordance with the terms of the applicable provider agreement or as permitted under applicable federal law or state laws or regulations . . . . If an in-network provider does not submit its claim to the health insurer in accordance with the requirements of this subsection, then (i) the covered patient shall have no obligation to pay for health care services for which the in-network provider was required to submit its claim[.]

Va. Code § 8.01-27.5.

### 2.     Ms. Shelton's VCPA Claim Founders Because She Fails to Plausibly Allege a Violation of Va. Code § 8.01-27.5

Ms. Shelton predicates her VCPA claim on ECC's alleged violation of Va. Code § 8.01-27.5, which she contends "prohibit[s] [] ECC from collecting any amounts from the Plaintiff[.]" (ECF No. 34 ¶ 145.)  But this Court has already explained that such an argument cannot be sustained under the law.  *See* Section III(A)(3)(a) *supra*.  Pointing to a different Virginia law does not alter the Court's analysis.  Ms. Shelton's contention that

36

Va. Code § 8.01-27.5 barred ECC from collecting debt from her fails because she identifies no "applicable federal or state laws or regulations" that required ECC to submit its claim to Medicaid. Va. Code § 8.01-27.5; *see also Kozlowski*, 42 F.3d at 1447 ("Medicaid is essentially a payer of last resort").

Ms. Shelton's Amended Complaint does not state a claim on her own behalf, so she does not qualify as an adequate class representative under Federal Rule of Civil Procedure 23 for the class for which she asserts Count VI. *See* Fed. R. Civ. P. 23(a)(3) ("representative parties [may sue] on behalf of all members only if . . . the representative parties will fairly and adequately protect the interests of the class.") Because the Amended Complaint fails to state a VCPA claim as to Ms. Shelton—the sole class representative—the VCPA claim may not be brought as a class claim. Therefore, the Court will dismiss the Amended Complaint's VCPA cause of action against ECC in Count VI.

F. **The Amended Complaint Fails to State a Claim Against Medlytix for a Violation of the Fair Debt Collections Practices Act (Count VII)**

Count VII of the Amended Complaint asserts a Fair Debt Collections Practices Act ("FDCPA") claim on behalf of Ms. Shelton and "the FDCPA Class", which the Amended Complaint defines as:

> All natural persons (a) who received services at an emergency room from an emergency provider employed by Defendant ECC; (b) who were Medicaid managed care organization plan members at the time of such services; (c) as to whom Defendant Medlytix engaged in collection communication directly or indirectly, including third-party communications, after engagement by Defendant ECC for collection action more than thirty days after the emergency room services; (d) who paid Defendant ECC money any amount of money in the year before the filing of this action in excess of the amount

allowed by contract or law for the services provided by the emergency provider employed by Defendant ECC; and (e) whose payment Defendant ECC shared with Medlytix.

(ECF No. 34 ¶ 157.)

### 1.    Legal Standard:  FDCPA

The FDPCA "authorizes private civil actions against debt collectors who engage in certain prohibited practices." *Rotkiske v. Klemm*, 589 U.S. 8, 9 (2019).  Among other things, the purpose of the act is "to eliminate abusive debt collection practices by debt collectors [and] to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged[.]" 15 U.S.C. § 1692e.  Section 1692e of the FDCPA forbids the use of "any false, deceptive, or misleading representation or means" to collect a debt and provides a non-exhaustive list setting forth examples of prohibited conduct.  *See* 15 U.S.C. § 1692e.  These examples include making a false representation of "the character, amount or legal status of any debt," § 1692e(2)(A), and using "any false representation or deceptive means to collect or attempt to collect any debt," § 1692e(10).  The FDCPA also prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."  § 1692f.  This includes "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  § 1692f(1).

An action under the FDCPA must be brought "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d).[18] "That language unambiguously sets the date of the violation as the event that starts the one-year limitations period." *Rotkiske*, 589 U.S. at 13; *see also Bender v. Elmore & Throop, P.C.*, 963 F.3d 403, 407 (4th Cir. 2020) (citing *Rotkiske*, 140 S. Ct. at 360). "The statute of limitations begins to run when the communication that violates the FDCPA is sent." *Babakaeva v. PTR Invs., Inc.*, No. 2:21cv267 (RAJ), 2022 WL 807381, *6 (E.D. Va. Feb. 11, 2022) (quoting *Richardson v. Shapiro & Brown, LLP*, 751 F. App'x 346, 349 (4th Cir. 2018)), *aff'd*, No. 22-1272, 2022 WL 17103767 (4th Cir. Nov. 22, 2022). The Supreme Court of the United States has clarified that there is no "discovery rule" for FDCPA claims, so "absent the application of an equitable doctrine, the statute of limitations in § 1692k(d) begins to run on the date on which the alleged FDCPA violation occurs, not the date on which the violation is discovered." *Rotkiske*, 589 U.S. at 10.

## 2.    Ms. Shelton's FDCPA Claim is Time-Barred

Ms. Shelton alleges that "Medlytix violated the FDCPA by falsely demanding and seeking to collect, on behalf of [] ECC, amounts not permitted to be collected by contract or law," citing 15 U.S.C. § 1692e. (ECF No. 34 ¶ 164.) She further alleges that

---

[18] 15 U.S.C. § 1692k(d) provides:

**(d) Jurisdiction**

> An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.

15 U.S.C. § 1692k(d).

"Medlytix violated the FDCPA by collecting amounts not permitted to be collected by contract or law, including as to [Ms. Shelton] within the year preceding the filing of her Complaint", again citing 15 U.S.C. § 1692e. (ECF No. 34 ¶ 165.)  In opposition to Medlytix's Motion to Dismiss, Ms. Shelton states that her "counsel inadvertently typed 15 U.S.C. § 1692e instead of 15 U.S.C. § 1692f"[19] with regard to the allegation in ¶ 165 (ECF No. 51, at 22.)  She argues that "[n]otwithstanding this typo, Ms. Shelton plainly pleaded a violation of 15 U.S.C. § 1692f[.]" (ECF No. 51, at 22.)  Regardless of whether this Court construes Ms. Shelton's FDCPA claim as having been pled under 15 U.S.C. § 1692e or § 1692f, her claim is time-barred.

In her Amended Complaint, Ms. Shelton describes two actions undertaken by Medlytix as it tried to collect the medical debt at bar:  (1) Medlytix's issuance of a bill to State Farm "by mail or wire" on January 27, 2022 to collect $1,177,00; and (2) Medlytix's representation to Ms. Shelton's legal counsel in August of 2022 that "Ms. Shelton remained responsible" for the $1,177.00 charge.  (ECF No. 34 ¶¶ 51, 83.)  Both these actions occurred over a year before Ms. Shelton filed suit in this case on December 13, 2023.  (*See* ECF No. 1.)

In her opposition, Ms. Shelton argues—without citing any authority—that the FDCPA violation occurred when Ms. Shelton's "counsel sent payment by check . . . to [] ECC for $1,177.00 on or about December 14, 2022" and "ECC shared a portion of this $1,177.00 with [] Medlytix." (ECF No. 51, at 23.)  However, "'the statute of limitations

---

[19] At base, section 1692e prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.  In contrast, Section 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.

begins to run when the communication that violates the FDCPA is sent.'" *Richardson*, 751 F. App'x at 349 (quoting *Lembach v. Bierman*, 528 F.App'x 297, 301 (4th Cir. 2013)).

Even reading her allegations favorably, Ms. Shelton does not state a claim that she brought her FDCPA claim within one year from August 2022 when Medlytix communicated to Ms. Shelton's counsel that she was responsible for the bill—the later of the two communications that she alleges violated the FDCPA.

### 3.    Even if Ms. Shelton's FDCPA Claim Were Not Time-Barred, She Would Fail to Plausibly Allege a Violation of the FDCPA

Ms. Shelton alleges that Medlytix violated the FDCPA by "falsely demanding", "seeking to collect", and "collecting" "amounts not permitted to be collected by contract or law." (ECF No. 34 ¶¶ 164–65.)  For the reasons articulated above, Ms. Shelton's claims that Defendants were not permitted to collect the debt "by contract or law" fail. *See supra* Sections III(A) and (B).

Ms. Shelton's Amended Complaint does not state a claim on her own behalf, so she does not qualify as an adequate class representative under Federal Rule of Civil Procedure 23 for the class for which she asserts Count VII.  *See* Fed. R. Civ. P. 23(a)(3) ("representative parties [may sue] on behalf of all members only if . . . the representative parties will fairly and adequately protect the interests of the class.")  Because the Amended Complaint fails to state an individual FDCPA claim as to Ms. Shelton—the sole class representative—the FDCPA claim may not be brought as a class claim.  Therefore, the Court will dismiss the Amended Complaint's FDCPA Claim against Medlytix in Count VII.

41

## IV.  Conclusion

For the reasons articulated above, the Court will grant the Motions to Dismiss as to

all counts.  (ECF Nos. 41, 43.)

An appropriate Order shall issue.

Date: 3/25/25                                           /s/
Richmond, Virginia                          M. Hannah Lauck
                                            United States District Judge